LEVITT CORPORATION and LSI United
Corp., Plaintiffs-Appellees,

v.

William J. LEVITT, International Commu-
nity Corporation, International Con-
struction Corporation, and Levitt Indus-
tries, Inc., Defendants-Appellants.

Nos. 530, 553, Dockets 78–7520, 78–7606.

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1979.

Decided Feb. 22, 1979.

Jay Goldberg, New York City (Curtis E. Claymont, New York City, John L. Pollok, Hoffman, Pollok, Mass & Gasthalter, New York City, of counsel), for defendants-appellants.

David I. Goldblatt, New York City (Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for plaintiff-appellee Levitt Corp.

Kane, Dalsimer, Kane, Sullivan & Kurucz, New York City, for plaintiff-appellee LSI United Corp.

Before KAUFMAN, Chief Judge, and WYATT, District Judge.*

IRVING R. KAUFMAN, Chief Judge:

In 1929, William J. Levitt founded Levitt and Sons. In the intervening decades, Levitt and Sons has risen to national prominence in the housing industry, but the original founder and owner has relinquished his role. We are asked to determine the extent to which Mr. Levitt, having sold both his company and the goodwill it has accumulated over the years, may publicize his name

---

* United States District Judge for the Southern District of New York, sitting by designation.

Circuit Judge J. Joseph Smith recused himself at oral argument. The case was heard by two judges pursuant to Second Circuit Rule § 0.14(b) and with the consent of the parties.

and record of experience, as he embarks on new ventures in real estate development.

## I.

William Levitt was, until January 1968, the controlling shareholder of Levitt and Sons (a New York corporation), builders best known for residential communities in New York and Pennsylvania called "Levittown." In that year, he agreed to merge his business into a wholly-owned subsidiary of ITT Corporation known as ITT Levitt, Inc. This was shortly renamed Levitt & Sons, Inc. (Delaware). The new company succeeded to all rights to the assets of Levitt and Sons (the old New York corporation), including the goodwill, trademarks, trade names, service marks and service names associated with that corporation. The marks included the registered names "Levitt", "Levitt and Sons", and "Strathmore"[1] as well as the common law trademark "Levittown". In exchange for his shares of Levitt and Sons, Mr. Levitt received more than 550,000 shares of ITT common stock, with a market value in excess of $60 million. In addition, ITT agreed to employ Mr. Levitt for at least five years at a minimum annual salary of $175,000.

ITT, however, ran afoul of the antitrust laws, and in 1971 Judge Blumenfeld directed the conglomerate to divest itself of its interest in the Levitt company.[2] To implement its order, the court appointed Victor Palmieri and Company as trustee, with directions to structure an operating company out of the assets of ITT's subsidiary and to dispose of the new firm as an ongoing business. In July 1976, the subsidiary transferred certain of its assets, including all of the trademarks and goodwill associated with the business, to Levitt Corporation, a plaintiff in the present action.[3] The trustee continued to manage Levitt Corporation until February 1978, when the business was sold to Starrett Housing Corporation for $30 million. Levitt Corporation has continued to exploit the "Levitt" marks; indeed, its current projects include seven housing developments in Florida, all of which are currently being promoted in advertisements and brochures as "Levitt" enterprises.

At the same time that ownership of the Levitt firm was regularly changing hands, Mr. Levitt's employment contract with ITT and its successors underwent a series of refinements as well, culminating in a covenant in November 1975 with Levitt & Sons, Inc. (Delaware). Mr. Levitt agreed that until June 1977, he would not enter any business involving the construction, sale, or leasing of residential housing, or the development of unimproved land for use in such construction. After that date, Mr. Levitt could return to the industry in which he had been so successful, provided that he abided by several restrictions.[4] In particular, he

1. "Strathmore" is a name arbitrarily affixed to several of the communities constructed by the firm.

2. *United States v. ITT* (No. 13,320 D.Conn. Sept. 24, 1971).

3. The remaining assets of Levitt & Sons, Inc. are still owned by ITT; this subsidiary changed its name to LSI United Corp. in 1977, and is a co-plaintiff in the instant litigation.

4. The restrictions are set out in paragraph 5 of the agreement, which states:

Mr. Levitt acknowledges and agrees that he does not have, either now or at any time in the future, (i) the right to use, or to authorize anyone else to use, the name "Levitt" alone or in conjunction with any other names or words, as the corporate, firm or business title, trade name or trademark of any business in any part of the United States or elsewhere in the world engaged in any of the activities described in Paragraph 3 hereof [i. e. residential development and construction] or in the construction of office buildings or other nonresidential properties or (ii) the right to associate himself in any capacity, as owner (except ownership of shares of a publicly held corporation, which ownership does not involve control or managerial or operational responsibilities), partner, officer, director, employee or otherwise, in any business engaged in any of the activities described in Paragraph 3 hereof which uses the name "Levitt" in any of the manners described in clause (i) of this sentence. Notwithstanding the foregoing, after June 30, 1977, Mr. Levitt shall have the right to use his own name, privately or publicly (including, without limitation, in stationery, publicity releases and advertising), as a corporate officer or director in any corporation or other business enterprise engaged in any such business activities (but which does not use the name

explicitly acknowledged that he does not have any right to use the name "Levitt" as a corporate title, trademark or trade name in the construction business. He did retain the right to use his own name publicly as a corporate officer or director of a business enterprise, but only to the extent that such use would not be likely to create confusion with the corporate title, trademarks, or trade names of Levitt & Sons, Inc.

Unfortunately, this accommodation of interests soon fell apart. In 1976, Mr. Levitt used the designation "William J. Levitt and his Associates" in the course of promoting a project in Nigeria. When challenged, Mr. Levitt conceded that his use of this business title violated the 1975 covenant. Under the terms of a settlement agreement executed in August 1976, any future breaches of the contract would subject him to both injunctive relief and liquidated damages of $520.24 per day.

But the story does not end there. As we noted earlier, Levitt Corporation now has seven residential projects in various stages of development in Florida. The corporation decided to build largely to capitalize on the goodwill purchased from Mr. Levitt, for it was believed that Levitt is a valuable name, particularly among residents of the Northeast who are approaching retirement age.

Mr. Levitt, however, regarded these efforts with disfavor, and in February 1978, the covenant not to compete having expired, he went on the offensive. He issued a press release stating that Starrett's acquisition of Levitt Corporation is "totally confusing the general public and the business community," and that the question being posed by all is "who and what is the real Levitt." The press release announced that Mr. Levitt and the International Construction Corporation (ICC) would shortly reveal plans to build "a new Levittown in the United States." Inquiries were directed to Levitt Industries, Inc.[5]

The promise of the press release was soon fulfilled, for Mr. Levitt and ICC issued a series of statements announcing that land had been purchased near Orlando, Florida, and that Mr. Levitt planned to build a $600 million "Levittown" there. Despite notification from counsel for Levitt Corporation that these actions violated both the trademark law and the 1975 contract, Mr. Levitt pursued the promotion of his Orlando project. He purchased advertisements in the *Washington Post*, the *New York Times*, and elsewhere, bearing the names "Levittown Florida", "Strathmore" and referring to "Levitt and Sons" and to "Levitt's Engineering and Planning Department". Most significantly, William Levitt identified himself as the founder of the company that had built the Levittowns of New York, New Jersey, and elsewhere.

█ Faced with Mr. Levitt's second refusal in as many years to abide by the bargain he struck when he sold his business, Levitt Corp. brought this suit. On July 18, 1978, alleging, *inter alia*, violations of the Lanham Act, 15 U.S.C. § 1114, and of the common law of unfair competition, it obtained a temporary restraining order prohibiting Levitt and the two corporations he heads from publishing any promotional material using the names or marks "Levitt," "Levittown," and "Strathmore" in connection with the development or sale of residential dwellings.[6] The application for a preliminary injunction was consolidated with a trial on the merits. Judge Pratt, after trial, ruled that Mr. Levitt had infringed upon the trademarks of the Levitt Corporation and that his use of his name in conjunction with the marks had caused sub-

"Levitt" in any of the manners described in clause (i) of the foregoing sentence), provided that his use of such name shall not be in such manner as would be likely to create confusion with LVS's [Levitt & Sons, Inc. (Delaware)] corporate title, trade names or trademarks.

5. Mr. Levitt himself is the Chief Executive Officer and controlling shareholder of both Levitt Industries and ICC.

6. Judge Pratt explicitly relieved the defendants of any obligation to recall any advertisements, press releases, or other promotional material distributed prior to the date on which the temporary restraining order was issued.

stantial actual confusion between the two enterprises. Considering both the scope of the Levitt Corporation's activity in Florida under the "Levitt" name, and Mr. Levitt's own large-scale entry into the central Florida real estate market, Judge Pratt found such a muddle to have been "inevitable." Indeed, the record reveals that numerous telephone calls, letters, and even reservation deposits were sent to Levitt Corporation on the mistaken assumption that it was building in Orlando.[7]

Turning to the question of relief, Judge Pratt concluded that the defendants' publicity campaign, by focusing on Mr. Levitt's past accomplishments, had generated such confusion that "it is necessary that strong and substantial restrictions . . . be imposed . . . to protect plaintiffs in their rights." Accordingly, he enjoined the defendants from using the terms "Levittown" and "Strathmore" in connection with their Orange County (Florida) project. Moreover, he required the defendants not only to remove the "Levittown" name from all advertising, maps, streets, government application forms, and other documents, but also, upon plaintiff's request, to issue corrective advertising explaining the suit, to restore the plaintiffs to the position they held before Mr. Levitt invaded the Florida market.

The defendants do not question the propriety of these portions of the order.[8] Judge Pratt went on, however, to forbid the defendants "from issuing any press releases or advertising, or generating any publicity concerning William J. Levitt's connection with the Orange County Development" for a period of two years. Acknowledging that this restriction exceeded that to which the parties agreed in 1975, the court below reasoned that it was required to counteract the damage done to the plaintiffs by Levitt's subsequent actions. The prohibition is limited to the Florida venture, and does not preclude disclosure of Levitt's connection with the project insofar as it is necessary to comply with state law, or to attract potential financial backers.[9]

In addition, Judge Pratt forbade the defendants from publicizing Mr. Levitt's prior connection with Levitt and Sons and its related corporations. This restriction, which is to be applied permanently and to all future residential developments with which Mr. Levitt may be connected, is designed to avoid the likelihood of confusion that would arise if the defendants could invoke the names of earlier Levitt projects in reciting the highlights of his career.

On appeal, Mr. Levitt argues that these last two restrictions are unnecessarily broad, and may jeopardize his Orlando development. We affirm the order of the district court in all respects.

## II.

Mr. Levitt does not contend that he has an absolute right to the use of his own name. He recognizes that the 19th century solicitude for this "sacred" interest has yielded in the face of modern marketing techniques that create name recognition and foster goodwill. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731,

---

7. The district judge's findings of fact, including findings on the question of actual confusion, are not subject to reversal unless they are "clearly erroneous." *See*, Fed.R.Civ.P. 52(a); *Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 509 (2d Cir. 1969); *Friend v. H. A. Friend & Co.*, 416 F.2d 526, 530 (9th Cir. 1969), *cert. denied*, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). The defendants have not challenged any of Judge Pratt's findings of fact on this appeal.

8. Nor do they contest the award of $79,642.62 by Judge Pratt to the plaintiffs on the basis of the liquidated damages clause in the 1976 settlement agreement.

9. Specifically, Judge Pratt stated that the injunction was not intended to preclude truthful disclosure to any governmental or financial body, or to those from whom financial backing is being solicited. Since the record did not reveal whether any government regulations would require disclosure of Levitt's experience in the building field to prospective purchasers, Judge Pratt declined to assume that such disclosure was required, but informed the parties that they could apply to the court for modification of the decree in the event that it became necessary.

734 (2d Cir. 1978). When a name is used as a trademark, it risks becoming a symbol of the corporation and its past accomplishments and losing its individual identity. *See* 3 R. Callman, *Unfair Competition, Trademarks and Monopolies,* § 85.2(d)(1), at 1036 (3d ed. 1969).

Indeed, Mr. Levitt disavows any intention of using his name as a trademark. He does argue, however, that the absolute two-year ban on public disclosure of his personal participation in the Orlando project fails to reflect "a judicious balancing of the countervailing interests of protecting an individual's use of his name and the avoiding of confusion," *Friend v. H. A. Friend & Co.,* 416 F.2d 526, 534 (9th Cir. 1969), *cert. denied,* 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). He urges that the rights of the two parties should be reconciled by allowing him to publicize his involvement with the Orlando project with a clause disclaiming any relationship to Levitt Corporation. Such relief, he contends, would protect the goodwill purchased by Levitt Corporation without seriously imperilling his enterprise or shattering the confidence of those whose interest in investing in "Levittown Florida" was based on their awareness of his personal participation.

█ We believe that several persistent themes may be distilled from the judicial attempts to resolve conflicting interests in the use of trade names by imposing appropriate injunctive relief. If the infringing party has had some experience of his own in an industry, and wishes to establish a business under his own name, it is considered unfair to preclude him from using his name under all circumstances and for all times, although the first-comer has established a reputation and goodwill under the same appellation. *See, e. g., Taylor Wine Co., supra,* 569 F.2d at 735–36; *John B. Stetson Co. v. Stephen L. Stetson Co.,* 85 F.2d 586 (2d Cir.), *cert. denied,* 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936).

█ Where, as here, however, the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable. *See Taylor Wine Co., supra,* 569 F.2d at 735; *Guth v. Guth Chocolate Co.,* 224 F. 932 (4th Cir.), *cert. denied,* 239 U.S. 640, 36 S.Ct. 161, 60 L.Ed. 481 (1915); *Le Page Co. v. Russia Cement Co.,* 51 F. 941 (1st Cir. 1892); *Hat Corp. of America v. D. L. Davis Corp.,* 4 F.Supp. 613 (D.Conn.1933).

█ Goodwill is a valuable property right derived from a business's reputation for quality and service. *See, e. g., Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 412–13, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Clairol, Inc. v. Asaro,* 1975 Trade Cas. ¶ 60,- 350 at 66,473 (E.D.Mich.1975). When a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and of the sole authority to market its products. *See, e. g., Le Page Co. v. Russia Cement Co., supra,* 51 F. at 945. The value of goodwill obviously becomes diluted—and sales lost—if confusion arises in the mind of the public over the source of the reputable goods or services. *See, e. g., Scholl, Inc. v. Tops E. H. R. Corp.,* 185 U.S.P.Q. 754, 759 (E.D.N.Y.1975); *Clairol, Inc. v. Cosway Co.,* 184 U.S.P.Q. 583, 586 (C.D.Cal.1974). To protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to "keep for himself the essential thing he sold, and also keep the price he got for it," *Guth v. Guth Chocolate Co., supra,* 224 F. at 934. And if the district court finds that the seller has attempted to arrogate to himself the trade reputation for which he received valuable consideration, broad remedies may be effected to restore to the plaintiff the value of his purchase.

█ In the case before us, we are satisfied that Judge Pratt did not abuse his broad discretion in issuing an injunction barring Mr. Levitt from publicizing his participation in his Florida venture for two

years.[10] This is not a case in which an overly broad injunction must be modified on appeal, *see, e. g., Taylor Wine Co., supra,* 569 F.2d 731, since the record amply justifies the district court's conclusion that "strong and substantial restrictions" were required to protect the plaintiff. Scores of persons, including former Levitt employees, wrote to Mr. Levitt and ICC on the assumption—encouraged by Mr. Levitt's advertisements and press releases—that they would be dealing with the company responsible for the Levittowns of the Northeast. Indeed, as Levitt Corporation had anticipated, many inquiries came from residents of Levitt-built projects in the Northeast who desired to move to warmer climes. Strikingly, significant numbers of letters were addressed to Mr. Levitt personally, and waxed nostalgic about the years their authors had lived in Levitt homes. One enthusiastic lady wrote Levitt that she remembered "how you personally inspected one of the houses and painted black marks on the items which were not finished correctly," and a doctor on the verge of retirement harked back to the day when Mr. Levitt himself accepted his deposit on a house.

Manifestly, it is precisely this goodwill for which Levitt Corporation paid Mr. Levitt. The record makes it plain that the promotion of William J. Levitt's name and the manner in which it has been repeatedly linked to Levitt Corporation's marks has created substantial confusion with the plaintiff's venture. We think that the remedy fashioned by Judge Pratt is a reasonable means of dispelling some of the confusion caused by the defendants' advertising campaign. It will also allow Levitt Corporation to make up some of the ground it lost in Florida due to the dissipation of its goodwill.

We therefore reject Mr. Levitt's contention that because the 1975 agreement contemplated his return to the real estate market under his own name after June 1977, Judge Pratt abused his discretion by inappropriately extending the contract terms. Wholly apart from the contractual stipulation that Mr. Levitt may use his name only in a manner not likely to create confusion with Levitt Corporation, it is beyond cavil that a district court sitting in equity may devise a remedy that extends or exceeds the terms of a prior agreement between the parties if it is necessary to make the injured parties whole. *See Premier Industrial Corp. v. Texas Industrial Fastener Co.,* 450 F.2d 444, 448 (5th Cir. 1971). *Cf. Le Page Co. v. Russia Cement Co., supra,* 51 F. at 943. Without such authority, we fail to see how the district judge could cure the harm suffered by the plaintiff.

### III.

For similar reasons, we uphold the third decretal paragraph of the injunction, also attacked as unduly broad by Mr. Levitt. Based on the evidence before him, Judge Pratt concluded that any attempt to call public attention to Mr. Levitt's achievements as President of Levitt and Sons would inevitably connect his name to the "spectacular success" of that firm. Moreover, publicity associating Mr. Levitt with the corporate history would create confusion with the marks of Levitt Corporation, resulting in the dilution of the goodwill purchased by the plaintiffs. Accordingly, the district judge permanently enjoined the defendants, in connection with future residential developments, from issuing press releases, brochures, advertising, or publicity concerning Mr. Levitt's prior association with the projects of Levitt and Sons.

---

**10.** The framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is ordinarily within the domain of the trial court. *See Frostie Co. v. Dr. Pepper Co.,* 361 F.2d 124, 127 (5th Cir. 1966); *Esquire, Inc. v. Esquire Slipper Mfg. Co.,* 243 F.2d 540, 545 (1st Cir. 1957). *Cf. Menendez v. Saks & Co.,* 485 F.2d 1355, 1375 (2d Cir. 1973), *rev'd on other grounds in part*

*sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), *cert. denied in part,* 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976). *See generally Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

The findings on which Judge Pratt predicated this portion of the decree are not clearly erroneous,[11] and justify the relief granted. Mr. Levitt's 1975 contract explicitly forbade confusing uses of his name, and Levitt Corporation's trade reputation is symbolized by the marks "Levittown," "Levitt and Sons," and "Strathmore." To permit Mr. Levitt to proclaim his "track record" by recounting his stewardship of Levitt and Sons would, perforce, free him to link his name to those marks and profit from the ensuing confusion.[12] Accordingly, since we believe that Judge Pratt reasonably determined that an injunction of this scope was necessary to prevent confusion and to protect the value of plaintiff's goodwill, we affirm.[13]

---

**11.** *See* footnote 7, *supra.*

**12.** Under these circumstances, a disclaimer of any *current* relationship between Mr. Levitt and the corporation will not protect the plaintiff's rights, for the effect of such a statement would be to inform the public that the achievements to which Levitt Corporation justly lays claim really are attributable to the efforts of someone else, now in business for himself.

**13.** The plaintiffs have cross-appealed from Judge Pratt's denial of their application for attorney's fees. Under § 35 of the Lanham Act, 15 U.S.C. § 1117, such fees may be awarded in "exceptional cases." Judge Pratt found that Mr. Levitt's conduct did not warrant an award of attorney's fees, and the plaintiffs have not cited us to a single case in which such a ruling by a district judge was overturned. We decline to do so here.