The **JOHN CURRY SKATING COMPANY, INC., Plaintiff,**

v.

The **JOHN CURRY SKATING COMPANY a/k/a the John Curry Skaters, et al., Defendants.**

**Civ. A. No. 85–2624.**

United States District Court, District of Columbia.

Oct. 19, 1985.

Nils Victor Montan, Ward, Lazarus, Grow & Cihlor, Washington, D.C., for plaintiff.

Stuart F. Pierson, Nancy A. Wadka, Verner, Lippfert, Bernhard, McPherson & Hand, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The plaintiff in this action, The John Curry Skating Company, Inc. (the "JCS Company"), is a not-for-profit corporation,

organized under New York law for the purpose of presenting ice skating shows. Defendant John Curry is a renowned ice skater and an Artistic Director of ice skating shows. Defendant Frozen Assets, Inc., a New York corporation, markets John Curry's services. Defendant John F. Kennedy Center for the Performing Arts, a not-for-profit corporation organized under the laws of the District of Columbia, promoted John Curry's ice skating show given in August, 1985. The JCS Company filed this complaint for injunctive relief and damages against defendants as a result of John Curry's performances with The John Curry Skating Company a/k/a The John Curry Skaters in August of this year. Plaintiff alleges unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), from defendants' use of the name "The John Curry Skating Company" and "The John Curry Skaters." Plaintiff also sets forth claims under New York state law for common-law trademark and service mark infringement, dilution, unfair competition, breach of contract, intentional injury to business, and conversion. This Court has subject matter jurisdiction based on the Lanham Act claim under 15 U.S.C. 1125(a) and 28 U.S.C. 1338, and exercises pendent jurisdiction over the state law claims.

A temporary restraining order was denied on August 20, 1985 and expedited discovery was ordered by the Court. On September 13, 1985, the Court denied plaintiff's motion for a preliminary injunction and defendant Kennedy Center's Motion to Accelerate and Consolidate a Hearing on the Merits. This case is presently before the Court on defendants' John Curry and Frozen Assets, Inc.'s Motion to Dismiss or in the Alternative for Summary Judgment of the Lanham Act and breach of contract claims, and on defendant Kennedy Center's Motion to Dismiss or in the Alternative for Summary Judgment on the same grounds.

### Factual Background

Defendant John Curry is a well-known ice skating artist, who began his professional skating career after winning the British, European and World titles and the Olympic Gold Medal in Men's Figure Skating in 1976. Curry Affidavit of 9/2/85, ¶ 14. Curry's professional performances included shows of "balletic ice skating," wherein an ensemble of skaters performed pieces to live orchestra music on specially prepared theater stages. *Id.* at ¶¶ 15–17. The shows, appearing in England and the United States, were variously named "John Curry's Theatre of Skating" (December, 1976), "John Curry's Theatre of Skating II" (1977), and "John Curry's Ice Dancing" (November 1978–February 1979). *Id.* A book entitled *John Curry* was written by Curry and Keith Money, published in England and the United States in 1978. *Id.* at ¶ 17.

In 1982, John Curry, Elva Clairmont and David Spungen agreed to form an organization that would present and promote the performances of Curry and a balletic ensemble of skaters. Defendant Kennedy Center's Statement of Material Facts as to Which There is No Genuine Dispute (hereinafter Kennedy Center's Undisputed Facts) at ¶ 1; Clairmont Affidavit of 9/3/85, ¶ 8. Ms. Clairmont had produced, directed and promoted ice skating shows since 1975, including Pro-Skate, a competitive professional figure skating show in which John Curry had appeared. Clairmont Affidavit of 9/3/85 at ¶ 7; Curry Affidavit of 9/2/85 at ¶ 20. David Spungen has also had experience producing figure skating events. Clairmont Affidavit of 9/3/85 at ¶ 8. In February, 1983, Symphony on Ice, Inc. (hereinafter "Symphony"), plaintiff JCS Company's predecessor in interest, was incorporated in New York to promote and present performances by Curry and a skating ensemble. Kennedy Center's Undisputed Facts ¶ 2. Symphony executed a contract with Frozen Assets, Inc. on August 19, 1983, for the exclusive rights to Curry's performances and name for three years. *Id.* at ¶ 3; Complaint Exhibit A.

In order to produce the type of balletic repertory ice shows that Curry, Spungen and Clairmont envisioned, significant re-

hearsal time was needed. Accordingly, the skaters rehearsed with Curry for fourteen weeks in 1983, receiving salaries, lodging and transportation from funds Symphony raised. Clairmont Affidavit of 9/3/85 ¶ 11. The skaters, billed as "The John Curry Skating Company," appeared under the auspices of Symphony from January 1984–April 1984. Kennedy Center's Undisputed Facts, ¶¶ 6–8. The costs of sustaining such a repertory company were high, and to better finance the productions, JCS Company, a not-for-profit corporation was formed and in 1984 took over the promotion and production of the skating ensemble's performances. There was no written assignment to JCS Company of Symphony's contract with Curry and Frozen Assets, Inc. The skaters appeared in performances arranged by JCS Company until late 1984. *Id.* at ¶ 8. Plaintiff JCS Company and its predecessor, Symphony, spent in excess of $600,000 on advertising and promoting The John Curry Skating Company from 1983 until 1985. Clairmont Affidavit 9/3/85 at ¶ 27. The performances were artistically very successful and received great critical acclaim. *Id.* at ¶¶ 21–30.

In early 1985, disputes arose among the parties about the management and promotion of the skating company. JCS Company's undisputed debts totaled more than $1.1 million at that time, and the company had been black-listed by the Musician's Union for non-payment. Kennedy Center's Undisputed Facts, ¶¶ 14, 19. In February, 1985, Ms. Clairmont fired the company's booking agent, Columbia Artists Management, Inc., for failing to arrange bookings, and sought engagements and prospects independently, with some success. Kennedy Center's Undisputed Facts ¶ 16; Plaintiff's Response ¶ 3. After negotiations between Clairmont, Curry and Spungen failed to resolve their disputes, John Curry resigned from the Board of Directors of JCS Company, Inc. and severed all relationship with the corporation. Kennedy Center's Undisputed Facts ¶ 21.

In July, 1985, Curry signed a contract with the Kennedy Center for a skating engagement from August 8–24, 1985. At least eight of the skaters appearing with Curry at the Kennedy Center had performed with the ensemble for JCS Company, and the format and presentation of the show was substantially the same as the shows performed under the auspices of the JCS Company. The skaters appeared under the name "The John Curry Skating Company" and "The John Curry Skaters." Although the show was a critical success, it finished with a net loss of approximately $400,000. Kennedy Center's Undisputed Facts, ¶ 24. At the time of the hearing, Curry and his skaters had future performances scheduled.

The plaintiff instituted this action on August 16, 1985, for a determination of rights in the name "The John Curry Skating Company," and under the contract between Symphony and Frozen Assets.

### Discussion

Plaintiff's claim under § 43(a) of the Lanham Act is based on its asserted rights in the service mark or trade name "The John Curry Skating Company," which allegedly are infringed by performances of Curry and his skaters under the name "The John Curry Skating Company" or "The John Curry Skaters." To establish a claim of unfair competition, the plaintiff must show: (1) that the public associates the mark in question with *plaintiff's* services and (2) that defendants' actions cause a likelihood of confusion among the relevant class of buyers. *E.g., ChiChi's Inc. v. Chi-Mex, Inc.,* 568 F.Supp. 731, 734 (W.D.Pa. 1983). The law of unfair competition under § 43(a) encompasses a plethora of claims, which may be based on rights in unregistered marks, trade dress and packaging, and personal names. The proof needed to establish a claim varies with each type of mark. It is therefore important to define the specific mark in which plaintiff's rights are asserted before proceeding with analysis under the Lanham Act. Plaintiff claims rights to a trade name comprised of a personal name of a living individual. No one presently employed by or otherwise currently a part of plaintiff's corporation bears this name. Plaintiff and its predecessor first began to use the name "John

Curry" in 1983, and only used the name in conjunction with performances featuring John Curry. Additionally, a three-year personal services contract granted plaintiff's *predecessor* corporation the exclusive right to use the name for the term of the contract. Plaintiff claims rights in the mark based on the contract and on the sums spent advertising and promoting the name.

Because the mark in question contains a personal name, not plaintiff's own, the plaintiff can only establish the first element of a claim for unfair competition by showing that the mark has acquired "secondary meaning." *See, e.g., Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3rd Cir.1978). Secondary meaning exists when the primary meaning of the tradename as identifying an individual is overshadowed in the mind of the consuming public by the origin or quality of the product or service marketed under the name. *E.g., Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2d Cir.1979); *Scott Paper Co.,* 589 F.2d at 1228. Although there is no quantifiable test to determine when secondary meaning is achieved, courts consider as relevant (1) the duration and continuity of use of the mark, (2) the extent of advertising and promotion and amount of money spent thereon and (3) figures showing sales or viewings of plaintiff's product. *E.g., American Association for Advancement of Science v. Hearst Corp.,* 498 F.Supp. 244, 257 (D.D.C.1980). Plaintiff's use of the mark can date no earlier than February, 1983, when its predecessor Symphony was formed to begin promoting Curry's balletic skaters. The plaintiff stopped using the mark after Mr. Curry severed relations with the corporation in March of 1985. Advertising expenses of approximately $600,000.00 were incurred in connection with promotion of the mark, and resulted in successful, critically acclaimed performances.

Two and a half years of use, more than half a million dollars in promotional expenses, and critical praise are stepping stones to the achievement of secondary meaning in a mark. Courts that found

secondary meaning in a personal name mark, however, were presented with evidence of much longer use and more substantial investments in advertising and other promotional expenses than found here. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731 (2d Cir.1978) (mark used for over 90 years, with nearly 10 million dollars of advertising expenditures in ten years); *ChiChi's, Inc.,* 568 F.Supp. at 736 (twenty-five years of continuous use and advertising of name); *Markel v. Scovill,* 471 F.Supp. 1244, 1249 (W.D.N.Y.1979) (continuous use of trade name for fifty years and expenditures of "considerable sums" on product promotion and advertising). Cases, such as *Duggal v. Krishna,* 554 F.Supp. 1043, 1047 (D.D.C.1983), in which secondary meaning in a mark is found after comparatively brief use, are not dispositive, because none have involved *personal name* marks. This distinction is not lightly noted: the interest an individual has in conducting an enterprise under his own name, using his own skills and knowledge, is protected by the Courts, and his right to use his name will not be lightly wrested from him. *E.g., Taylor Wine Co.,* 569 F.2d at 735. For this reason, a higher showing is required to establish secondary meaning in a personal name mark. The undisputed facts of this case material to the issue of secondary meaning, when viewed in the light most favorable to plaintiff, do not establish that plaintiff has given secondary meaning to the mark "The John Curry Skating Company."

At oral argument, plaintiff contended that any secondary meaning or "celebrity value" that John Curry had given to his name passed, *in toto*, to plaintiff through the contract between Frozen Assets and Symphony, and must be added to plaintiff's use of the name to determine whether secondary meaning exists. Given the nature of the underlying contract,[1] the Court is not persuaded by this argument. Although many of the facts surrounding the assignment of the contract and the parties' performance thereunder are bitterly contested, it is undisputed that the contract was for

---

1. For the purposes of the motion for summary

judgment only, the Court assumes that a con-

the personal services of Mr. Curry, and not for the sale of his "business," his name, or his goodwill. The right to use John Curry's name for three years was coterminous with Mr. Curry's performance of services under the contract. The contract thus resembles a license agreement. Plaintiff's reliance on cases involving parties' rights subsequent to outright sales of businesses, and their personal-name marks, is misplaced.[2] The contract at issue did not confer secondary meaning on the mark, and the potential validity of the parties' claims of breach and wrongdoing does not permit this dispute to be cloaked with the protection of the Lanham Act. *See generally, Silverstar Enterprises, Inc. v. Aday,* 537 F.Supp. 236, 242 (S.D.N.Y.1982) (dispute between licensee and licensor of trademark dismissed for lack of jurisdiction under Lanham Act).

Under Rule 56 of the Federal Rules of Civil Procedure, a grant of summary judgment is appropriate where there are no disputed issues of material fact and the moving party is entitled to a judgment as a matter of law. *See also Barrer v. Women's National Bank,* 761 F.2d 752, 757 (D.C.Cir.1985). The facts material to the necessary first element of plaintiff's claim of unfair competition are undisputed. Failure to establish secondary meaning in the mark vitiates plaintiff's claim of protectable rights in the mark. Defendants accordingly are entitled to a grant of summary judgment on the claim under the Lanham Act. As a result, the Court is left with plaintiff's pendent state law claims for breach of contract, tort, trademark and unfair competition. When the federal claim to which state claims are joined is dismissed before trial, the state law claims should ordinarily be dismissed as well. *United Mine Workers v. Gibbs,* 383 U.S.

715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As plaintiff's pendent claims implicate exclusively considerations of state law, the Court finds no reason to exercise its discretion to retain the claims. For the foregoing reasons, defendants' motion for summary judgment must be granted in part, and defendants' motion to dismiss the remaining claims for lack of federal jurisdiction will also be granted. An order consistent with the terms of this opinion shall be issued.

---

tractual relationship existed between plaintiff and John Curry during the relevant times. The Court recognizes that many material facts regarding this relationship remain in dispute, and makes no finding as to the validity of the various claims in contract.

**2.** The plaintiff relies heavily upon *Levitt Corp. v. Levitt,* 593 F.2d 463 (2d Cir.1979), in crafting its Lanham Act claim. In *Levitt,* however, the secondary meaning of the mark "Levitt" was not

contested. The mark had been registered, which in itself is *prima facie* evidence of secondary meaning, and was among the assets transferred to the purchaser of Levitt's firm. *Id.* at 465. Plaintiff downplays these predicate facts, focusing instead upon the relative postsale rights of Mr. Levitt and the new Levitt firm to use the mark. On the facts of the instant case, such analysis is premature.