**In re Paolo GUCCI, et al., Debtors.**

**Bankruptcy No. 94 B 40614 (JHG).**

United States Bankruptcy Court,
S.D. New York.

Oct. 9, 1996.

Pryor, Cashman, Sherman & Flynn (Harold Jones, of counsel), New York City, for Paolo Gucci Design Studio.

Winick & Rich (Jonathan Flaxer and Scott Wyner, of counsel), New York City, for the Trustee.

Gibson Dunn & Crutcher (Kevin Barrett, of counsel), New York City, for Guccio Gucci.

Parker Duryee Rosoff & Haft (Allan Samuels, of counsel), New York City, for Orologi Paolo Inc.

### DECISION ON MOTION TO DETERMINE WHETHER POST PETITION DESIGNS ARE PROPERTY OF THE ESTATE

JEFFRY H. GALLET, Bankruptcy Judge.

### I. Introduction

Paolo Gucci Design Studio ("PGDS") moves [1] to declare that certain designs, creat-

---

1. The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

ed by Paolo Gucci ("Paolo"), after the filing of his bankruptcy petition, are not property of the bankruptcy estate. Frank G. Sinatra, the chapter 11 trustee (the "Trustee"), opposes the motion. Orologi Paolo, Inc. ("OPI") and Guccio Gucci ("GG") oppose the motion.[2]

This motion springs from the Trustee's motion to approve a settlement (the "Global Settlement") among the Trustee, Paolo, PGDS, Normans Ltd., Penelope Jayne Armstrong and her company, Centralbest Limited. That motion was made on December 19, 1995, shortly after Paolo's death in October. The center piece of the Global Settlement was the formation of a licensing entity, PGDS, in which Paolo and Enzo Stancato ("Stancato") would hold the master license for all of Paolo's licensing rights in the United States. Paolo would hold the remaining worldwide rights. PGDS would enter into various sublicenses, the income from which would be used to pay the Trustee for the rights.

The Committee of Unsecured Creditors (the "Committee") objected to the Global Settlement, arguing that it was essentially a sale of the estate's most valuable asset, the Paolo Gucci name and trademark, which must be done by sale pursuant to 11 U.S.C. § 363. The Committee then presented a bid by GG to buy the name and trademark. I ordered an auction.

PGDS, claiming ownership of certain post petition designs, then moved to determine whether Paolo's post petition designs were property of the estate.

At the auction, GG was the successful bidder. One of the requirements of the GG bid was a determination that the name, trademarks and post petition designs were property of the estate. GG and the Trustee claim that the purchased assets include:

(a) all trademarks, service marks, trade names, business names and commercial names that contain the words "Paolo," "Gucci" or "Paolo Gucci";

(b) all rights to use the name "Paolo Gucci" commercially including, but not limited to, all rights under the Final Judgment, dated July 1, 1988, as modified, in *Paolo Gucci v. Gucci Shops, Inc.* 83 Civ. 4453, 1988 WL 75263 (WCC) (S.D.N.Y.)

(c) every design, process, invention, trade secret, computer program, formula and similar property relating to any and all products designed or selected by, or to any and all designs created or selected by or under the supervision, direction or authority of, or approved by, Paolo Gucci, whether prepetition or post petition, used or to be used in connection with the name "Paolo Gucci"; and

(d) all rights to license the use of any of the forgoing (subject the right, title and interest of the estate and Orologi Paolo Corp. in connection with that certain licensing agreement dated January 1, 1990 as amended and assumed under Section 365 of the Bankruptcy Code).

The parties concede that the primary commercial value of the post petition designs is that they can be marketed under Paolo's name.

## II. Facts

### A. The Licensing Business

In 1981, after leaving GG, Paolo started licensing the name "Paolo Gucci" for various products.

In November 1988, he entered into an agreement with Creazioni Creative Corp. (The "CCC Agreement" and "CCC"). CCC was granted the exclusive right to sublicense Paolo's trademark outside of the United States. In addition, CCC and Paolo entered into a second agreement whereby CCC agreed to hire Paolo, as an independent contractor to create designs for CCC, act as a consultant and make promotional appearances.

At about the same time, Paolo entered into an agreement with P.G. Creative Ltd. (The

---

**2.** Initially, Jennifer Puddefoot Gucci, Paolo's widow, moved for an order declaring that she owned the post petition designs. By stipulation, she acknowledged that the designs are property of the estate, and her motion has been withdrawn.

"PG Agreement" and "PG Creative") under which he gave PG Creative the "exclusive right to use for any or all lawful purposes the name 'Paolo Gucci', 'Gucci' or any other similar name or mark that in any way represents or reflects goodwill or commercial value available to [Paolo] legally to use for commercial purposes." In addition, he conveyed "[a]ll designs, creations, inventions, ideas and similar intellectual property ... now or hereafter created by [Paolo] for commercial purposes." Moreover, the PG Agreement granted PG Creative "[t]he exclusive right to license the rights described ... above."

PG Creative and CCC each entered into various sublicensing agreements,[3] allowing their sublicensees to use Paolo's designs, the name "Paolo Gucci" and the phrase "Paolo Designed by Palo Gucci." The agreements provided that the designs, ornamental appearances and copyrights for the licensed products were the "sole property of Licensor," and that Paolo was to be employed, appointed or retained as the respective licensor's designer. Paolo was also required to make public appearances and provide design and consultation services as required by the sublicensees.

In November 1992, Paolo entered into yet another agreement, this time with Licensing by Paolo (the "L.P. Agreement" and "L.P."). Under that agreement, L.P. was to regulate Paolo's licensing business in the United States with various sublicensees. Like the CCC and PG Creative agreements, Paolo agreed to provide design services and make personal appearances to promote the products.[4]

It is significant to note that each of the agreements contemplated that products other than those actually designed by Paolo would bear his name and/or trademark.

In December 1992, Paolo and PG Creative agreed to terminate the PG Creative Agree-

ment. In April 1993, it appears that Paolo terminated the CCC Agreement. Paolo then assumed the rights and obligations of CCC and PG Creative under their respective sublicensing agreements.

In September 1993, Paolo entered into an agreement with Marketing Group Establishment (The "MGE Agreement" and "MGE"), granting MGE the "exclusive right to sublicense, manage and to use [Paolo's 'trademarks'] in the United States and a nonexclusive right to sub-license, manage and to use [Paolo's 'trademarks'] outside of the United States." The MGE Agreement further provided that all goodwill in the trademarks inured solely to the benefit of Paolo and that any trademark registrations with respect to such "trademarks" shall be in Paolo's name and be his sole property. Paolo agreed to provide design and consultation services to MGE.

### B. The Filing

On February 4, 1994, Paolo filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Local Bankruptcy Rule 52, Soo Kim, Paolo's authorized representative, filed an affidavit which stated:

> [Paolo] is an individual whose principal business consists of the licensing of trademarks for use in various commercial ventures and design work in conjunction therewith. This petition is necessitated by several disparate litigated matters which are threatening the commercial viability of the trademarks and licenses.

In his schedules, Paolo listed his interest in certain trademarks in the United States and Korea as an asset valued at $5,000,000. In addition, in response to a question concerning the nature of his business, including sole proprietorships, Paolo listed his interest in "Paolo Gucci Designs," his sole proprietor-

---

3. These sublicensing agreements included agreements with Milano Furs, for fur and leather wear; Status Eyes, Ltd., for eye wear; Orologi Paolo Corp., for watches; Mega Corp Home Furnishings and Meubles Renel Inc., for furniture; Billy Who, for certain clothing; Trackwise Sales Corp., for products in Korea; and Ultima International Pens and Accessories, for pens, key

chains, picture frames, money clips and belt buckles.

4. L.P. entered into sublicensing agreements with Second Shot, I; Jenny T., Inc.; Gem International, Inc.; Ultima International Watches, Inc.; Ultima International Pens and Accessories, Inc. and L.J. Global, Inc.

ship licensing business, which utilized his trademarks and name.

After the filing, I ordered the appointment of a chapter 11 trustee to administer Paolo's estate. One of the Trustee's first tasks was to investigate the various licensing businesses. He discovered that several sublicensees were actively marketing Paolo Gucci products and that there was some litigation resulting from Paolo's failure to live up to his obligations under the various licensing agreements. The litigation prevented the launching of certain products and, in addition, damaged the reputation of Paolo's licensing business. Moreover, the bad publicity that Paolo had been receiving regarding his pending divorce proceedings and his mistreatment of certain horses on his horse farm further damaged the goodwill associated with his trademarks and name.

Paolo did not assist the Trustee with his efforts to work with the various licensees and sublicensees. He does not know if Paolo created any designs post petition. However, Stancato testified that Paolo told him that he created numerous designs after the commencement of the case.

## III. Law

11 U.S.C. § 541 defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."

> As previously stated, under section 541(a) the estate is normally comprised only of property and interests therein belonging to the debtor at the time the petition is filed. In general, property not then owned but subsequently acquired by the debtor does not become property of the estate, but becomes the debtor's, clear of all claims that are discharged by the bankruptcy proceeding.

L. King, Collier on Bankruptcy, ¶ 541.05 (15th Edition, 1996).

11 U.S.C. § 541(a)(6) and (7) provide that property of the estate includes:

> (6) Proceeds, product, offspring, rents and profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.
>
> (7) Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. § 541(a)(6) and (7).

 There is no dispute that Paolo's prepetition property is now owned by the estate. At issue is what happens to any designs created post petition.

> Prepetition assets, ..., are those assets rooted in the debtor's prepetition activities, including any proceeds that may flow from those assets in the future. These assets belong to the estate and ultimately the creditors. Post petition assets are those that result from the debtor's post petition activities and are his to keep free and clear of the bankruptcy proceeding.

*In re Andrews*, 80 F.3d 906, 910 (4th Cir.), *reh'g denied*, 90 F.3d 102 (4th Cir.1996).

The Supreme Court has held that when post petition property "is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as [debtor's] 'property'." *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). In *Segal*, the Supreme Court determined that potential claims for loss-carryback refunds would be included in the debtor's estate because they were rooted in the pre-bankruptcy past.

A similar conclusion was reached in *Andrews*. After the Court determined that payments to a debtor pursuant to a prepetition non-compete agreement were not excluded under the "earnings from services performed" exception in 11 U.S.C. § 541(a)(6), it found the payments rooted in the debtor's prepetition sale of his business and, therefore, property of the estate. *In re Andrews*, 80 F.3d at 911.

PGDS argues that a simple reading of 541(a) leads to the conclusion that any property acquired after commencement of the case does not become property of the estate, but remains the debtor's. Therefore, it contends, the designs Paolo created post petition, belonged to him. In addition, PGDS argues that the post petition designs are

excluded from 11 U.S.C. 541(a)(7) in that the designs were not acquired by the estate, post petition, but rather they were acquired by Paolo, the debtor. *Casey v. Hochman,* 963 F.2d 1347 (10th Cir.1992); *In re Doemling,* 127 B.R. 954 (W.D.Pa.1991).

In *Casey,* the Tenth Circuit determined that a patent on a device invented by the debtor after the commencement of the case, and the revenues from the invention, was property of the debtor and not property of the estate. In *Doemling,* the District Court for the Western District of Pennsylvania determined that the debtor's cause of action for an automobile accident which occurred five months after the commencement of the case was not property of the estate. In each case, the court relied on a literal reading of 11 U.S.C. 541(a). However, while I agree with the holdings in *Casey* and *Doemling,* they are distinguishable here. PGDS has not established that the post petition designs are not property of the estate. *In re Cooley,* 87 B.R. 432, 441 (Bankr.S.D.Tex.1988).

PGDS fails to acknowledge that these post petition designs, if they are to be marketed under Paolo's name, are clearly rooted in Paolo's prepetition activity. When Paolo filed his petition, his sole business was the licensing of his name. His principal asset was his interest in his name and trademarks. That name and those trademarks, together with the designs of the licensing business, became property of the estate upon the filing of the petition. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–205 & n. 9, 103 S.Ct. 2309, 2313–2314 & n. 9, 76 L.Ed.2d 515 (1983). Moreover, "upon the bankruptcy of the trademark owner, the trademark together with the goodwill it symbolizes becomes vested in the trustee in bankruptcy...." *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 874 (E.D.N.Y.1978); *U.S. v. Inslaw, Inc.,* 932 F.2d 1467, 1471 (D.C.Cir. 1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992).

Shortly after Paolo filed his petition, I appointed the Trustee who acceded to all the rights of the debtor, at the time of the filing. Those rights included the right to operate the business of the debtor and to administer all the property that became property of the estate, including Paolo's trademarks, designs and goodwill. 11 U.S.C. § 1108.

Ultimately, the Trustee chose to sell Paolo's licensing business. The sale of a trademark includes the sale of the mark along with the goodwill and tangible business assets which go along with the trademark. *United States Ozone Co. v. United States Ozone Co. of America,* 62 F.2d 881, 885–86 (7th Cir.1933). It would be impossible for the Trustee to sell the trademark without the other essential items that go along with it. "A trademark is not a property right in gross which may be sold apart from the business or goodwill with which the trademark has been associated." *Marshak v. Green,* 746 F.2d 927, 929 (2d Cir.1984). Indeed, if the tangibles of a bankrupt are sold without goodwill or trademarks being sold, the trademark ceases to exist. *Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.,* 773 F.2d 925, 931 (7th Cir.1985).

Moreover, "[w]hen a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and the sole authority to market its products." *Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2d Cir.1979). Therefore, "[t]o protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to 'keep for himself' the essential thing he sold, and also keep the price he got for it." *Id.,* citing *Guth v. Guth Chocolate Co.,* 224 F. 932, 934 (4th Cir), *cert. denied,* 239 U.S. 640, 36 S.Ct. 161, 60 L.Ed. 481 (1915).

If I were to find that Paolo's post petition designs were not property of the estate, I would essentially be creating in Paolo the right to continue the very business the Trustee sold. Paolo's ability to create designs bearing his name and trademark is so inexorably tied to the licensing business that it is impossible to separate the two. They are in fact one in the same, and each cannot exist without the other.

I agree with the Trustee's characterization that if this were a situation where Paolo designed for another company, and those

designs were to be used in conjunction with a trademark, other than "Paolo Gucci," then Paolo probably would have been entitled to retain those post petition designs, and the revenue flowing therefrom. However, those are not the facts before me. Paolo, and his purported successor in interest, PGDS, cannot be allowed to continue the business of licensing Paolo's name and trademark. That business, which the Trustee is selling, is the exact business for which Paolo originally sought bankruptcy protection.

Therefore, it is the determination of this court that any post petition designs created by Paolo were done to be marketed under the Paolo name and trademark and are property of the estate. Any party possessing post petition designs shall deliver them to the Trustee, forthwith. In addition, anyone possessing designs created by Paolo is enjoined from using those designs in connection with the names "Gucci" or "Paolo Gucci" or the phrase "Paolo by Paolo Gucci" and retains no rights to use the "Paolo Gucci" name commercially. All rights to utilize the "Paolo Gucci" trademark vest with the Trustee, and then with his assignee.

Settle Order.