### HILTON INTERNATIONAL CO., INC., Plaintiff,

v.

### HILTON HOTELS CORPORATION, Conrad International Hotels Corporation, Hilton Hotels U.S.A., Inc., Conrad Royalty Corp. and Conrad International Investment Corp., Defendants.

91 Civ. 7510 (JFK).

United States District Court,
S.D. New York.

May 15, 1995.

---

Cowan, Liebowitz & Latman, P.C. (Robert J. Bernstein, Richard S. Mandel, of counsel), New York City, for plaintiff.

Brumbaugh, Graves, Donohue & Raymond (Joseph D. Garon, Doreen L. Costa, Thomas J. Parker, of counsel), New York City, for defendants.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

KEENAN, District Judge:

### BACKGROUND

Plaintiff, Hilton International Co., Inc. ("HI" or "International"), seeks a permanent injunction restraining defendants from using the name CONRAD in connection with hotels located outside the United States and otherwise enforcing the terms of a certain Trademark Agreement. This agreement, PX 1,[1] was entered into by the parties on December 1, 1964. This Trademark Agreement provides *inter alia* that HI has the exclusive right to use HILTON as the name of hotels operated outside the United States; and Hilton Hotels Corporation ("HHC") has the exclusive right to use HILTON as the name of hotels operated within the United States.

The 1964 Agreement also includes a provision permitting the parties to operate hotels outside their designated HILTON territories provided the hotels are (i) not named "HILTON," and (ii) not "directly" or "indirectly" advertised, promoted or identified as "HILTON" hotels. *See* PX 1. Plaintiff maintains that defendants are violating this agreement by operating hotels known as "CONRAD" in several locations outside the United States.

A summary of the pleadings should be helpful in order to follow and understand this decision. HI brings the following causes of action against HHC based on HHC's use of the name CONRAD for its international properties: (1) breach of an agreement not to advertise, promote, or identify hotels operated outside the United States directly or indirectly as HILTON hotels; (2) breach of an implied covenant not to derogate from the value of goodwill in HILTON transferred by HHC to HI; (3) unfair competition under New York common law; and (4) false advertising under § 43(a) of the Lanham Act. HI

seeks an injunction against use of the name CONRAD, and damages.

HHC raises the following affirmative defenses: (1) failure to state a claim for which relief can be granted; (2) unclean hands based on the fact that HI previously evidenced an interpretation of the Trademark Agreements which is opposed to the positions asserted by them in this lawsuit and that HI caused the harm that they now seek to remedy; (3) laches, acquiescence and estoppel based on HI's delay in asserting its rights as well as its affirmative acts which evidenced a consent to the use of the name CONRAD, while HHC expended significant sums developing and promoting the name CONRAD; (4) fair use of the name of HHC's founder, Conrad Hilton; and (5) The statute of limitations bars HI from asserting that the manner in which "CONRAD" was used before October 1988 in promoting, advertising and identifying the CONRAD hotels in Australia and St. Martin, breaches the trademark agreements.

HHC asserts the following Counterclaims against HI: (1) breach of the trademark agreements as a result of HI's advertising, promotion and identification of VISTA hotels directly and indirectly as HILTON hotels; and (2) *prima facie* tort under New York common law resulting from simultaneous termination by HI of its participation in joint HHC–HI programs and the institution of this lawsuit with the sole intention of inflicting harm on HHC without excuse or business justification. HHC seeks an injunction and damages.

The trial has been bifurcated to first determine liability. If necessary, damages will be determined by a separate trial.

### FINDINGS OF FACT

Plaintiff HI is a Delaware corporation owned by a British conglomerate, Ladbroke Group PLC, having its principal place of business in London, England. HI owns or operates the HILTON hotel chain abroad, and the VISTA hotel chain in the United States. *See* Stip. at ¶ 1.

---

1. PX refers to Plaintiff's Exhibit, DX to Defendants' Exhibit and Tr. to Transcript page number. Stip. refers to Stipulated Facts in the Pretrial Order.

Defendant HHC is a Delaware corporation having its principal place of business in Beverly Hills, California. Through various subsidiaries, HHC owns, operates or franchises the HILTON hotel chain in the United States and the CONRAD hotel chain abroad. *See* Stip. at ¶ 2. Defendant Hilton Hotels U.S.A., Inc. ("Hilton USA"), is a Delaware corporation, and a wholly owned subsidiary of HHC, having its principal place of business in California. *See* Stip. at ¶ 3. Defendants, Conrad International Hotels Corporation, Conrad Royalty Corporation, and Conrad International Investment Corporation are Nevada corporations, and wholly-owned subsidiaries of Hilton USA, having their principal places of business in California. *See* Stip. at ¶¶ 4–7.

HI was organized by HHC in 1948 to establish HILTON hotels outside the continental United States. HHC's and HI's founder and first president was Conrad Hilton, the world-renowned hotelier. *See* Stip. at ¶¶ 7–8. HI began its expansion outside the United States in 1949 with the opening of the Caribe HILTON, a 300 room hotel in Puerto Rico. *See* Tr. at 922; PX 613. Over the next decade, HI opened HILTON hotels in Madrid, Istanbul, Mexico City, Panama, Havana, Montreal, Berlin and Acapulco. In 1964, HI was spun-off as a separate company. At that time, HI was operating 23 hotels around the world, with eight additional hotels under construction. *See* PX 613.

Conrad Hilton was integrally associated with HI's early development. *See* Tr. at 1930. After the spin-off in 1964, Conrad Hilton remained Chairman of the Board of Directors and President of both HHC and HI. While he continued to run HHC, Conrad Hilton ceased the active management of HI which was taken over by its then Executive Vice President, Curt Strand. *See* Tr. at 930–31, 942, 3354. However, his image and reputation were central to the openings of the various international HILTON hotels. *See* Tr. at 937. He was a major figure at the hotel openings, which were media events attended by movie stars, the press, local politicians and dignitaries. *See* Tr. at 923–28, 933–38; PX 1886, PX 1887, PX 1977. The openings generated extensive publicity, much

of it focusing on Conrad Hilton, who had his own public relations person. *See* Tr. at 925, 928, 935, 937, 1930–31, 3286. As a result of his close involvement with HI's development abroad, Conrad Hilton established a worldwide reputation as the founder of HI and the world's most famous hotelier. *See* Tr. at 3286–87. The names Conrad Hilton and HILTON both became very well known around the world (*see* Tr. at 1913, 3286–87), and Conrad Hilton's own image and reputation became closely associated with the HILTON name. *See* Tr. at 978–979.

From the founding of HI in 1948 until December 1, 1964, all of HI's issued and outstanding stock was owned by HHC. *See* Stip. at ¶ 10. In 1964, HHC's Board of Directors decided to spin-off HI as a separate company because Conrad Hilton's financial advisors believed the market was not fully appreciating the value of this company. *See* Tr. at 846–47, 3280–81. The HHC Board concluded that having HI and HHC trading as one stock "was like having a race horse and a plow horse" pulling the same wagon. *See* Tr. at 3281. The "race horse" in this analogy was HI, which HHC believed had tremendous growth potential. *See* Tr. at 3281.

HHC's Board of Directors eventually authorized the distribution of all the issued and outstanding stock of HI to HHC's shareholders of record as of November 16, 1964 on the basis of one share of HI for each two shares of HHC owned on that date. The shares of HI were mailed to the shareholders on December 1, 1964. *See* Stip. at ¶ 11. The combination of the two stocks appreciated by 35% as soon as the spin-off took place. *See* Tr. at 3281.

In connection with the spin-off, HI and HHC entered into a series of agreements, including the Trademark Agreement. *See* PX 1. HI and HHC also entered into two agreements, the same day, December 1, 1964, relating to the joint ownership and management of Hilton Reservation Service ("HRS") through Hilton Service Corporation ("HSC"), a corporation owned 51% by HHC and 49% by HI. *See* PX 2. The parties contractually committed to participate in

HRS for a period of forty years. *See* PX 2, at ¶ 9.

The Trademark Agreement was drafted by HHC. *See* Tr. at 852–53. It provided that it was to be construed in accordance with Delaware law. Under the Agreement, HI received the sole and exclusive right to use the HILTON name and trademarks outside the United States and HHC received the sole and exclusive right to use the HILTON name and trademarks in the United States (with the exception of certain specified rights given to HI with respect to a pre-existing HI hotel in Hawaii). *See* PX 1. The key provision of PX 1 so far as this lawsuit is concerned is contained in Section A, paragraph 4 thereof. It reads in pertinent part as follows:

> nothing contained herein shall prevent either Hotels or International from owning, leasing, operating, managing or licensing others to operate hotels, restaurants, bars or related facilities any place in the world under other than the "HILTON" name, service marks and symbols hereinabove referred to, provided that any such hotels, restaurants, bars or related facilities are not advertised, promoted or identified, directly or indirectly, as "HILTON" hotels.

The word "indirectly" is the problem because of subsequent actions by both HI and HHC.

The Trademark Agreement was designed to divide the goodwill associated with the HILTON name on a global basis. The agreement ensured that subsequent to the spin-off of HI from HHC and the commencement of their operation as separate companies, the goodwill associated with the HILTON name would inure exclusively to the benefit of HI outside the United States, and to the benefit of HHC within the United States. *See* Tr. at 932, 1911–12. This is confirmed by the testimony of Barron Hilton. *See* Tr. at 3278. Following the spin-off, the reputation in the HILTON name resulting from HI's historic activities outside the United States under Conrad Hilton's leadership was part of the value that went to the shareholders of HI. *See* Tr. at 1913.

In 1967, HI was purchased by Trans World Airlines, Inc. ("TWA") for approximately $90 million. *See* PX 13; Tr. at 848, 951, 3282. The key asset transferred to TWA was the exclusive ownership of the HILTON trademark and the goodwill associated therewith outside the United States. *See* Tr. at 3284, 3286. At the time of the TWA sale, Conrad Hilton and his family and foundation owned approximately one-third of HI's stock. *See* Tr. at 3282, 3284. They received approximately $30 million in TWA stock as a result of the sale, in 1967 dollars. *See* Tr. at 3284.

While HI was owned by TWA from 1967–1987, both parties operated their businesses independently. Marketing efforts were, with few exceptions, independently pursued. The parties did share the HRS and their principals periodically conferred with respect to the generation of business and possible expansion. *See* Tr. at 979, 980, 1003–1005, 3374.

Under the terms of PX 2, HSC operated HRS so that rooms could be reserved at hotels operated by both HHC and HI. HHC and HI were to promote the reservation service and participation of all hotels operated by HI and HHC in HRS was mandatory. *See* Tr. at 1810, 1811, 3373. The original 1964 HRS agreement (*see* PX 2) was amended by a letter agreement in 1978 (*see* PX 10). This called for HI and HHC to include such hotels as VISTAs [2] and CONRADs in HRS. These HRS agreements (*see* PX 2 and PX 10) permitted a further association between the Hilton and non-Hilton brands whether they were HI or HHC hotels. As a matter of fact, plaintiff's able counsel acknowledged that PX 10 "necessarily resulted in some degree of confusion." Tr. at 4120. As we shall see, HRS is one of the main causes of the dispute before the Court.

Following TWA's acquisition of HI, Conrad Hilton continued to hold the honorary title of Chairman of the company for several years. *See* Tr. at 850–51, 3354. He continued to participate in hotel openings, and was relied on by HI to perform various public

---

**2.** VISTAs are hotels owned by, or operated by, HI in the United States. More about VISTA as we progress in this decision.

relations tasks and ceremonial duties. *See* Tr. at 851, 3354. Conrad Hilton's book, "Be My Guest," was installed in all the rooms of the HILTON properties outside the United States through the mid–1980's, and his portrait was also shown in the lobbies of those hotels over that same period. *See* Tr. at 849–50. Conrad Hilton continued to work for HHC until just before his death in 1979 at the age of 92.

In 1987, HI was sold to Allegis Corp. *See* Tr. at 82–92. Later that same year, Allegis sold HI to the current owner, Ladbroke Group, a British conglomerate which operates hotels in the United Kingdom. *See id.*

In 1978, HHC and HI each considered operating hotels outside their contractual territories and going into each others exclusive HILTON territory. *See* Tr. at 857–861, 3289–3291. This led to the September 19, 1978 letter agreement. *See* PX 9.[3] The 1978 Letter Agreement established what came to be known as "the one-third rule." Under that provision, both parties were permitted to use the word "Hilton" as part of their company name to state the fact that the company owned, operated or licensed the hotel in the other's territory, provided such reference did not appear in greater than one-third the size of the actual hotel name. *See* PX 9; Tr. at 863–65. The 1978 Letter Agreement also permitted the parties to list their hotels operated outside their exclusive HILTON territory together with their HILTON hotels in the same directories, without regard to the one-third size restriction. *See* PX 9, Tr. at 900, 914–15. It is this agreement that is at the center of the difficulties arising in this lawsuit. Neither the consuming public nor the travel trade distinguished between HI and HHC. HI and HHC were perceived as a single worldwide organization. Both HI and HHC acknowledge this point.

Matters became more muddled by virtue of a May 1989 Amendment to the 1964 and 1978 agreements. *See* PX 11. Paragraph 1 of this modification provided that HHC and HI may:

use the Hilton name and trademark in each other's exclusive territories (as defined in the Trademark Agreement) to refer to their respective hotels in any and all printed advertising and/or promotional materials used in joint marketing programs in which HHC and HIC may from time to time both agree to participate, including, but not limited to, the HHC HHonors frequent guest program and the HHC Senior HHonors program for mature travellers. Such use of the Hilton name and trademark shall not be subject to size restrictions set forth in the 1978 Agreement.

PX 1, at ¶ 1. The 1978 Letter Agreement was still further modified by a 1990 letter agreement between HHC and HI. *See* PX 12. That agreement provided that it was permissible under the "one-third rule" to promote one or a number of hotels within the other party's exclusive territory ("the 1990 Letter Agreement"). *See id.*

Defendants point out that none of the agreements specifically prohibit either party from using the word "CONRAD" as the name for hotels operated outside its territory. Plaintiff urges that there is a natural linkage between the names CONRAD and HILTON and that the use of the name CONRAD by defendants violates the terms of the 1964 agreement (*see* PX 1) by "indirectly" advertising, promoting and identifying the CONRADs as HILTON hotels. Defendants argue that PX 11 "completely obviated the prohibition in the 1964 Agreement against *indirect* (emphasis in defense papers) identification as Hilton" because it expressly allowed direct use of "the Hilton name and trademark in each other's exclusive territories" in joint advertising which would identify the hotels in the other's territory as HILTON hotels. *See* PX 11. However, paragraph 4 of that 1989 Amendment reads as follows:

Nothing herein contained shall be deemed to otherwise affect or limit in any manner whatsoever the rights and obligations of the parties as contained in the Trademark Agreement and the 1978 Agreement, and

---

3. The parties at that time also entered into a separate letter agreement (*see* PX 10) permitting hotels operated within the United States by HI

and hotels operated outside of the United States by HHC also to be included within HRS. *See* Tr. at 865–66.

the aforesaid agreements shall remain in full force and effect in accordance with their respective terms.

PX 11, at ¶4. PX 11 was unilaterally terminated by HI on October 16, 1991, the day after this lawsuit commenced.

Let us now trace the steps that have gotten us to the situation in which these hitherto friendly and cooperating entities find themselves bitterly contesting each other.

The name CONRAD was first suggested to HHC in a January 26, 1981 letter (see PX 40; Tr. at 3297) to Barron Hilton, the Chairman of HHC, who is one of Conrad Hilton's sons.[4] The name CONRAD was formally selected for HHC's international properties in 1982. Greg Dillon, a 43–year employee of HHC, now vice chairman emeritus of the company, testified on direct examination concerning the choice of the name CONRAD.

Q. Shifting to a different subject now, Mr. Dillon, were you involved in the selection of the name CONRAD?

A. Yes, I was.

Q. What was your involvement?

A. At the time I was running what later became the Conrad International Company in the development of our international properties and in that capacity and also as a member of the president's, our president's executive staff and director of Hilton Hotels Corporation, I was involved with others in making the decision.

Q. And you ultimately reached a decision to select Conrad, is that correct?

A. That's correct.

Q. Why was Conrad selected?

A. Conrad was selected because of the fact that we were of the opinion based on the research that we had done both internally and externally the company that Conrad was the best name available to us for the new international company (sic).

Q. Did it have any other advantages in addition to that?

A. Well, it did have the advantage, the name Conrad had the advantage since it was the name of our founder, had the advantage of tying it back to Hilton Hotels Corporation USA whereby we would have the benefit of all the expertise, experience, prestige, financial ability and so on of the parent company.

Q. You referred to tying it back to your parent corporation. Did you have an understanding at that time that that was permissible under the '78 agreement?

A. I think we did, yes.

Q. How if at all did you wish to associate Conrad with the parent corporation Hilton Hotels Corporation?

A. Well, we wanted—the name Conrad or whichever name we might have selected, but it so happened it was the name Conrad was a new name. This was a new company. It did not have the same background and financial capability and so on as Hilton Hotels Corporation but was a subsidiary of Hilton Hotels Corporation and had its complete support and the executives and so on of the company, came out of Hilton Hotels and therefore that's what we wanted.

Q. In selecting or trying to connect Hilton Hotels Corporation with Conrad did you also think that you were connecting Conrad with Hilton International hotel?

A. No, we didn't.

Q. Was that your intent at all?

A. We did not intend to connect it with Hilton International.

Q. Did you take any steps to avoid any such connection?

A. Well, the steps we took were to make certain that whatever we did and whatever we said in all of our discussions with prospective investors and so on, that Conrad Hotels was the wholly owned subsidiary of Hilton Hotels Corporation USA and had no connection with Hilton International Company.

Q. Would you take a look at Exhibit HF1 which is before you, sir.

A. Yes.

Q. Would you identify it for us?

---

4. Interestingly, Anthony Carter, an executive of HI, in 1979 suggested the use of the name CONRAD for HI properties in the United States, but this idea was rejected by Curt Strand, then HI's President. See Tr. at 962, 963, 3714; DX AA–1.

A. It is a memorandum from me to James Collins dated January 30, 1982 relative to market testing for proposed international name.

Q. Do you recall sending this memo, sir?

A. I do.

Q. Look at the second paragraph. In the second sentence there is a statement "both of these names could be tied in well to the Hilton name and family through a public relations effort as well as advertising." Do you see that?

A. Yes, I do.

Q. What were the names you were referring to?

A. Either Conrad International or Barron Limited or Conrad Limited.

Q. By that statement what did you intend to mean?

A. We meant that it could be tied into Hilton Hotels Corporation USA to benefit from all of its background, experience, prestige, financial capabilities and so on.

Q. Did you have advertising or public relations activities in mind at this time?

A. No, we didn't, not at this point.

Q. Would you take a look at HF4 please. Can you identify it for us?

A. It is a memorandum dated July 14, 1982 from James Collins to a number of our senior officers in the company relative to the international name research.

Q. Do you recall receiving a copy of this memorandum?

A. I do.

Q. Would you look at the second page of the memorandum. Down towards the bottom there is a number of bullet indentations and one begins "Conrad immediately generates Hilton association, it also means chain smaller and his business imagery. Do you have any understanding as to what that meant? (sic).

A. Yes.

Q. What was that understanding, sir?

A. Well, Conrad by virtue of it being the name of Conrad Hilton immediately generates Hilton association—association with Hilton Hotels Corporation USA, and it talks about a smaller type chain and so on and so forth that was our international arm for Hilton Hotels Corporation USA.

Q. At the time of this memorandum and the selection of the Conrad name you were aware, were you not, of the Hilton International operations?

A. Yes, I was.

Q. Did you have a similar feeling that Conrad would immediately generate associations with Hilton International?

A. I did not feel it would generate associations with Hilton International because we specifically used it in connection with Hilton Hotels Corporation USA.

Tr. at 1813–1817.

As early as September 1982, HHC publicly and unequivocally announced its intent to use the name CONRAD. In HHC's 1982 Annual Report the following appeared:

The name Conrad International has been selected to best exemplify the standards of quality and sophistication that our company's founder, Conrad N. Hilton brought to the international lodging industry.

DX AB1, at DC46533.

The linkage between Conrad Hilton's first and last names was thus expressly announced in connection with Conrad International some nine years before the filing of this suit in October 1991. In the September, 1991 issue of PATA Travel News, Asia Pacific, Eric Hilton, another of Conrad Hilton's sons, is quoted concerning the use of the name CONRAD. At the time of this interview, Eric Hilton was President of Conrad International Hotels Corporation. He explained "If we said Conrad, we would be saying Hilton without really being able to say it." PX 53. *See* Tr. at 277–280. However, Curt Strand, former Chairman and C.E.O. of HI, testified that he "considered it permissible" under the terms of the contract with HHC for HHC to use the name CONRAD (*see* Tr. at 991) and that indeed it was "clever" to do so. *See* Tr. at 997.

The Court finds that plaintiff knew of HHC's plan to use and the use of the name CONRAD in connection with the ownership and operation of international hotels as early

as 1982, but made no protest or complaint about this.

The so-called "official launch" of CONRAD did not take place until June of 1989. *See* Tr. at 3314, 3315. However, between the selection of the name CONRAD in 1982 and 1989, CONRAD did open two hotels. They were the CONRAD JUPITERS CASINO on the Gold Coast (East Coast of Australia) and LA BELLE CREOLE in St. Martin in the Caribbean. *See* Tr. at 948–949. As plaintiff points out in its post-trial memorandum of law on page 4, neither of these hotels "compete directly with any of (HI's) hotels" and neither of them relied on the HILTON name in their advertising or promotions. *See* PX 316. The Australian hotel, a casino resort, formally opened in 1986 (*see* Tr. at 2524) and the St. Martin hotel opened in 1988. *See* PX 837.

So far as these two properties are concerned, plaintiffs have essentially indicated that they no longer contend that the existence or operation of either of them violates the terms of any agreement between the parties. HI has "no problem" with the CONRAD JUPITERS CASINO or LA BELLE CREOLE continuing to operate. *See* Tr. at 4134. The Court dismisses all of plaintiff's claims so far as they relate to these two properties.

Ladbroke purchased HI in October 1987 for a purchase price of one billion and seventy million dollars. *See* Tr. at 82; PX 16A at P32214. Of that amount, $470 million was attributed to the goodwill symbolized by the HILTON brand. *See* Tr. at 83–85; PX 18. John Jarvis, who was Chairman of Ladbroke Hotels when HI was acquired by Ladbroke (*see* Tr. at 66), became Chairman of HI after the acquisition in 1987. He testified convincingly on Direct Examination as follows:

Q. Turning to Plaintiff's Trial Exhibit 17 ... on page five of Plaintiff's Exhibit 17 under the heading Ladbroke and Hilton, it says, "The opportunity to acquire the best international brand name in any industry arises only rarely. The name of Hilton is synonymous with hotels and is recognized throughout the world as being associated with high standards of accommodation and service."

Was that statement in your view a material representation to shareholders?

A. It was just that. I mean, it was in this document and therefore every word in this document is material representation.

Q. Was that fact in your view of the strength of the international brand name Hilton being the best in the industry, was that to the Ladbroke board a key element in deciding to purchase Hilton International?

A. It was the—to take you back to the start of the story, the real thing we had to do was to acquire a global brand that would allow us to go into new territories with confidence, and the Hilton International brand did just that.

Q. Turning to page four ... under the heading background on Hilton, it states, "Hilton International Company was formed in 1948 as a separately managed subsidiary of Hilton Hotels Corporation. In 1964 Hilton was spun off as an independent public company with the exclusive right to use the Hilton name outside the U.S.A."

Was the exclusivity of the use of Hilton outside the U.S.A. an important factor in the decision of Ladbroke to purchase Hilton?

A. Oh, it was absolutely crucial.

Q. Can you explain that to the court?

A. Well, I had my—I mean, I had to find out whether or not, obviously, the offering document was accurate, that in fact it was truly offering the rights of Hilton International worldwide. And I was advised at the time that in their opinion it was, and, therefore, this really gave us the momentum to carry through the acquisition.

Had it not been, had there been any doubt in either my mind, our board of directors' mind, we certainly wouldn't have put our name to this document. I couldn't have been party to it.

Q. Do you believe in your role as the lead executive marshaling this acquisition through that the exclusivity in the Hilton name was important in your ability to raise funds under this one-for-five rights issue?

A. Without that you would not have walked into the city of London at that time and raised 256 million pounds, it would have been out of the question.

Tr. at 92–94.

Thus, the Court finds that when Ladbroke acquired HI, it did so because HI was the exclusive beneficiary of the goodwill associated with the name HILTON in the business of owning and operating hotels outside the United States of America.

Since the Ladbroke acquisition, HI has opened 42 hotels around the world (see Tr. at 197), including locations in China, Japan, Indonesia, Puerto Rico, Aruba, Scotland, France and Egypt. See Tr. at 107–08, 199–201. The growth of the HILTON brand worldwide has substantially increased the value of its goodwill or brand name value, which is now 2 to 2½ times greater than the $470 million attributed to it at the time of the Ladbroke acquisition.

After the Ladbroke purchase, HI and HHC began exploring the possibility of joint marketing and sales efforts in 1988. See Tr. at 175, 1425–27. Recognizing that consumers generally did not distinguish between HHC and HI anyway (see Tr. at 501, 2740), the parties believed that working together they could increase sales and reduce marketing costs (see Tr. at 177) and as Michael Ribero, HHC's Senior Vice President of Marketing and Strategic Planning testified, "given the fact that the consumer didn't discriminate between Hilton and Hilton International" they could "market the two companies as kind of a seamless entity." See Tr. at 2740.

After the Ladbroke purchase, HI and HHC continued to share positions on the Board of Directors and the Executive, Marketing, and Financing Committees of HRS. At meetings, joint marketing and charges to be levied on CONRAD for use of HRS were discussed. There is no evidence that HI protested CONRAD in the context of HRS. See Tr. at 341, 498, 3428–29.

On December 15, 1988, David Michels, then HI's Senior Vice President, advised HI's Chairman, John Jarvis, and Michael Hirst, the President, that HHC intended to open CONRAD hotels in Hong Kong, Istanbul, London and Brussels among several locations. There were HI hotels in each of those four cities. See DX AH–5. HI's executives and Board continued to be aware of CONRAD's expansion plans. There was no protest concerning CONRAD per se until this suit was filed. See Tr. at 1475, 1476, 3148. In June 1989, when CONRAD was officially launched, HHC commenced a public relations campaign in New York and London to introduce CONRAD's new logo and to promote the CONRAD hotels which there were plans to build. HHC explained CONRAD's past development and plans for future growth. HI made no objections against CONRAD at this time. See Tr. at 1875. The "official launch" was not the first introduction of the name CONRAD in the marketplace. CONRAD had been announced, advertised and promoted since 1982. See Tr. at 1872.

Apparently it was Martin Gatto, until December 1991 the Chief Financial Officer of HI, who first became concerned about the name CONRAD. His testimony on the subject follows:

Q. Did there come a time when you came to be of the view that the name Conrad used by Hilton Hotels Corporation for its hotels outside the United States might be a problem under the governing trademarks agreements between the companies?

A. Yes.

Q. When is the first time that you can recall considering that possibility?

A. It particularly came home to me as a result of a visit I made to Dublin at the time when Conrad were building a hotel in Dublin.

Q. Do you recall whether that was just prior to the actual opening of that hotel?

A. Yes, it was.

Q. Do you remember was that in 1989? I believe the record reflects that the Dublin property actually opened in November of 1989.

A. Yes, it would have been a short time before the hotel was actually built and finished but not actually opened.

530

Q. So sometime in 1989 you had occasion to see the hotel being built in Dublin?

A. It was built.

Q. It was built but not opened yet?

A. Yes.

Q. What about your visit to Dublin caused you to consider the view that the name Conrad could be a problem under the trademark agreement?

A. It just happened that I was in Dublin on other business and was there and became aware of this hotel and I started to think that the use of the Conrad name as a hotel was going to be very dangerous in the future because of the association with the famous person.

Q. By that famous person you are referring to Conrad Hilton?

A. Yes.

Q. And what was the nature of your concern in terms of how that might become dangerous?

A. Well, it would depend to some degree on how the name Conrad was used by Hilton Hotel Corporation. But in any event, no matter how it was used I don't think the public would ever disassociate the name Conrad Hilton from the name Conrad Hotel.

Q. So did that cause you a concern that that might be an indirect use of the name Hilton as a hotel name in Hilton International's exclusive territory?

A. I believed that the danger was that the public would come to see Conrad Hotels in their minds as Conrad Hilton because it is a natural follow-on to say the word Conrad Hilton if there is an association with Hilton Hotel Corporation.

Q. Was it your concern that that identification might become to be established as the actual name of the hotel?

A. Yes.

Q. So what I am asking is not that the public would understand some association with Hilton Hotels Corporation but would actually think of the hotel as the Conrad Hilton.

A. Yes.

Q. Did you have any conversations with Mr. Hirst subsequent to your visit to Dublin about that issue?

A. Yes, on my return from Dublin I said to Mr. Hirst that I had seen the building, the Conrad Hotel, and that I was concerned that this was going to be an issue for us to consider going forward, as each property emerged we would have to see how it was that Hilton Hotel Corporation went about the expansion of this chain but it was a very serious matter in my mind that the public may come to see these properties as Hiltons.

Tr. at 457–460.

Mr. Gatto further testified:

Q. To your understanding did Hilton International's position with respect to how it viewed the usage of the Conrad name at that point, was that affected in any way by the number of properties that were then in existence?

A. At what time are you talking? After my visit to Dublin?

Q. At the time of your conversations with Mr. Hirst, around that time period.

A. It was Mr. Hirst's view that whilst this needed to be watched, at the time there were so few properties and none of them were in locations which competed with Hilton International at that time and the branding, to the extent that it existed, was quite soft, it wasn't a hard branding, at that stage his view was that it was something we had to carefully watch. But at that time he didn't believe that it was a matter which we should aggressively follow.

Tr. at 463. Mr. Gatto's testimony was that the name Conrad was the subject of "an ongoing debate (he) had with Mr. Hirst." Tr. at 514. HI never conveyed its concerns about the name CONRAD to HHC until this lawsuit.

When the parties began exploring the joint marketing programs in 1988, they operated approximately 400 HILTON-branded hotels between them around the world. *See* Tr. at 1429. Of these, defendants operated two hotels abroad, the CONRAD JUPITERS CASINO and LA BELLE CREOLE while

HI operated approximately five hotels called VISTA in the United States. The membership, advertising, marketing and sales efforts the plaintiff and defendants engaged in including both the CONRADs and VISTAs in these joint efforts right up until after this lawsuit was filed on October 16, 1991 is demonstrated by DX JG1–4. The amount of money expended on these joint efforts ran into the millions of dollars.

The parties began implementing joint marketing programs in 1989. HI joined HHC's travel incentive program, HHonors, and the parties participated in joint print and television advertising campaigns. *See* Tr. at 1488, 1516–17. For the next two years, cooperative efforts continued to develop, and the parties successfully implemented several joint programs designed to leverage the strength of the HILTON brand to their mutual benefit. VISTA and CONRAD hotels were included in joint marketing programs. *See* Tr. at 1429–30, 1468. They both were beneficiaries of the HRS 1–800–HILTONS phone number.

Interestingly, executives at Conrad opposed the joint marketing efforts because they felt that such programs promoted HI's HILTON hotels outside the United States to the detriment of Conrad. *See* Tr. at 1956, 2312–13. HHC overruled the Conrad objection to joint marketing with HI and it went forward.

After the "official launch" in the Summer of 1989, CONRAD hotels opened in Monte Carlo (August 1989), Dublin (October 1989), London (January 1990), Hong Kong (September 1990) and Cancun (February 1991). Defendants' hotel in Monte Carlo was named LE METROPOLE PALACE. *See* Tr. at 461–62, 1845. The CONRAD Dublin which opened in October 1989 and the CONRAD London, January 1990, were the first hotels operated under the CONRAD name alone. However, HI has no hotel in Dublin and the CONRAD in London is an all-suite property located in an area of the city that does not directly compete with the HI hotels in London. They are in different parts of the city. *See* Tr. at 235, 236.

The first direct competition between an HI hotel and a CONRAD was in Hong Kong where the CONRAD Hong Kong opened in September 1990. Prior to the opening of the CONRAD Hong Kong Eric Hilton moved to Hong Kong and supervised the acquisition and development of the property there from 1986 to 1989. Eric Hilton became President of Conrad International in 1990.

The CONRAD Hong Kong and the Hong Kong HILTON[5] are located in the downtown business district, within a five minute walk of each other. *See* Tr. at 288, 289. They both seek to attract business customers, target the same market segments and are approximately the same size. *See* Tr. at 1951, 1952. During the period before the opening of the CONRAD Hong Kong, Eric Hilton stayed at Hong Kong HILTON, the International property, and some 15 to 20 other members of the CONRAD staff stayed there and received preferential treatment including 80% discounts. *See* Tr. at 2233, 2234. It is absolutely clear that HI knew of the defendants' plans to open the CONRAD Hong Kong long before the actual opening. After the opening, HI advertised the hotel in joint directories with HHC. *See* Tr. at 515. Both hotels participated in joint marketing programs. *See* DX ANe, DX AO3c, DX AR2a.

On September 19, 1990 the New York law firm of Fried, Frank Shriver & Jacobson wrote to HHC's Vice President and Assistant General Counsel, David Johnson, complaining about "the Conrad advertising campaign" on behalf of HI. *See* PX 653. The letter charged HHC with breaching the Trademark Agreement (*see* PX 1) and was followed by another letter on behalf of HI from another New York law firm, Seward & Kissel (*see* PX 657) dated November 13, 1990 reiterating the claims in the Fried, Frank letter. On November 29, 1990, Mr. Johnson responded "that this advertising does not contribute to the confusion among the public as to "Hilton" hotels but rather may alleviate some of it." *See* PX 658. None of this correspondence contained any complaint about the use of the

---

5. As of January 1995, the Hong Kong HILTON was to be no longer operated as a HILTON but HI plans to open a new hotel in Hong Kong in 1995. *See* Tr. at 4049.

532

name CONRAD. HHC advertisements and slogans such as "We are about to make Conrad Hilton's first name as renowned as his last" (*see* PX 178a) were the catalysts for HI's lawyers' letters.

In spite of their dispute over advertising, joint marketing efforts continued. A prime example of the confusion is the Sunday, July 21, 1991 Chicago Tribune. *See* DX BC 14. It contained an advertisement taken out by HI urging customers to visit the CONRAD Hong Kong which was listed adjacent to the Hong Kong HILTON. This HI ad also listed several other CONRADs interspersed with International hotels. Could anyone not be confused? The Court finds that HI was a prime contributor to the confusion. But that does not end the matter by a long shot!

Just as HHC decided to operate outside the United States so HI, even prior to the 1987 Ladbroke acquisition, had decided to operate in the United States. The vehicle HI used inside the United States was the VISTA hotel chain. According to Michael Hirst, the Chairman and CEO of HI, who succeeded John Jarvis in February 1990, HI was operating seven or eight hotels in the United States—five of which were called VISTAs—when joint marketing discussions began in 1988. *See* Tr. at 177. HHC points to HI's use of the name HILTON in connection with the VISTAs as evidence of HI's unclean hands. The VISTA hotels were in such cities as New York, Washington, D.C., Pittsburgh and Newark.

Anthony Carpenter, retired vice president of HI for U.S. operations, testified that in 1989 VISTA was "consciously" seeking to connect "the name VISTA to Hilton International" (*see* Tr. at 3689, 3695, 3696) and "consistently trying to tie Vista ... to Hilton International" (*see* Tr. at 3698) through press releases and advertisements. "[W]herever we could, we tied the two. Vista was Hilton International." Tr. at 3699. In about March 1989, senior management of HI agreed to drop the words "Operated By" and approved use of "A Hilton International" for VISTA in marketing materials. *See* Tr. at 1446; 3708–11. The signs at VISTA hotels during 1989, 1990 and 1991 often bore the words "A Hilton International" without the words "Oper-

ated by" and larger than one-third lettering. *See* Tr. at 1715, 1716. HI flew flags over the VISTAs proclaiming they were "HILTON" and used slogans like "TAKE ME TO THE HILTON" and "THE HILTON, THE HOTEL" to promote the VISTA properties in a campaign using brochures, magazines, newspapers, trade journals, directory advertisements, hotel gift certificates and direct mail pieces. *See* DX JG–5.

As efforts to market VISTA in the United States through the name Hilton were taking place, defendants were busy trying to connect the CONRADs to the name HILTON outside this country. Advertisements such as the "first international hotels with standards proud enough to bear his name" were run. *See* PX 214. Video infomercials shown at HHC hotels in guest rooms contained language such as the following from Eric Hilton: "Our position as far as CONRAD is concerned is that we're looking at as being the ROLLS ROYCE of the HILTON brand." PX 305; PX 308. The infomercial also described CONRAD as "a return to Conrad Hilton's standards of 5–star luxury and service." *Id.* This ad was revised at Eric Hilton's request so as to feature both the CONRAD and HILTON logos without regard to the one-third rule. *See* Tr. at 738, 739.

In connection with the marketing of the CONRAD name by HHC, and HI's reaction thereto, it is necessary to consider a meeting held at Dallas–Fort Worth Airport which took place on July 18, 1990 between Michael Ribero, HHC's chief marketing executive and David Michels, his counterpart at HI. Although there is some difference in recollection between the participants at the meeting, one aspect of it is quite clear. At the meeting, Mr. Ribero indicated to Mr. Michels the intention of HHC to position or market CONRADs as premium or luxury hotels. *See* Tr. at 1436, 2752, 2753. Further, Mr. Michels, HI's chief marketing executive, testified that he expressed no objection to this concept. *See* Tr. at 1570, 1571. Mr. Ribero reported to the highest levels of HHC management, including Eric Hilton, that Mr. Michels "had agreed to the new positioning strategy" for the CONRAD hotels and told

them that he believed "this would pave the way for additional joint marketing programs between" HHC and HI. Tr. at 2759.

Defendants continued to seek to expand the CONRAD chain overseas and HI used slogans promoting the VISTA properties in the United States by connecting them to the name Hilton without in any way complying with the one-third rule.

As discussed above, the first direct competition between a CONRAD and an HI hotel was in Hong Kong where the two hotels were both located in the business district. This occasioned Cavendish International Holdings Limited ("Cavendish") to complain about the inclusion of the CONRAD Hong Kong in HRS. Cavendish owned the Hong Kong Hilton although it was operated and managed by HI. Cavendish also was troubled by signage near the CONRAD proclaiming "CONRAD Hilton Hotels" (see PX 698–706) and because CONRAD Hong Kong telephone operators were answering the telephone CONRAD Hilton Hotels. This resulted in discussions between Michael Hirst of HI and Carl Mottek, Executive Vice President of HHC, concerning the problem. See PX 667, PX 670, PX 671; Tr. at 296–298. Cavendish and HI were able to resolve their problem. See PX 718.

By the summer of 1991, there was growing concern at HI about the signs at the CONRAD Hong Kong (see Tr. at 2578, 2583) and William Lebo, General Counsel for HHC, contacted his counterpart, Geoffrey Chester of HI. See Tr. at 2583. A meeting in London was arranged which was attended by Messrs. Lebo, Chester and Martin Gatto of HI on August 6, 1991. See Tr. at 2597. At this meeting, Mr. Gatto expressed the view that the defense was succeeding with the CONRAD chain, but that the VISTA line of hotels was not succeeding. See Tr. at 2600. At the meeting, Mr. Lebo provided HI with a copy of an internal legal memo he had written earlier concerning the interplay between CONRAD and Hilton USA and the goodwill of the name Hilton regarding CONRAD and VISTA. See PX 321. The memorandum pointed out that the CONRAD and VISTA marketing programs had to be better molded into the Hilton brand campaigns or else "sim-

ple intellectual debates over who can use what names and how could become lawsuits." Id. Nothing was really accomplished at the August 6 meeting, so a second meeting was held among the three men on August 9, 1991.

At the second meeting, it became clear to Mr. Lebo that the CONRAD signage was a serious problem for HI. This meeting was aggressive and hostile in tone and character. See Tr. at 488, 2605. However, the HI representatives did not specifically ask Mr. Lebo to drop the name CONRAD. See Tr. at 2606. No objection was raised to the word or name CONRAD. See Tr. at 2597, 2683. At this meeting, there was discussion about the possibility of the VISTA hotels being taken over by HHC and the CONRADS by HI. See Tr. at 488. This was known as the CONRAD–VISTA swap proposal and it was a very complicated proposition which also involved access to the Caribbean territory for HHC. This plan was under consideration by both companies in 1991, but it never came to fruition and this litigation ensued. See Tr. at 468–470.

Upon returning to the United States from the London meetings, HHC wrote to HI on August 16, 1991 proposing that the CONRAD logos read "CONRAD by Hilton Hotels Corporation." See DX FN 32. HI wrote to HHC on August 20, 1991 requesting that HHC postpone changes in CONRAD signs until HI had the opportunity to consider fully the CONRAD and VISTA branding issues. See DX FN 33; Tr. at 646, 647, 2610–2612. On August 20, 1991, the defense did issue a memo announcing the discontinuance of the logo "CONRAD Hilton Hotels." See PX 322.

On August 28, 1991, Martin Gatto wrote to Carl Mottek, then CEO of HHC. See PX 739. The letter contained the statement that "clearly if Conrad continues to compete in our territory this is going to lead to increasing conflict which will endanger the positive benefit of joint brand promotion, which is very evident to our companies." Id.

On October 2, 1991, Mr. Lebo again wrote to HI requesting a response to his proposal about changing the CONRAD signs (see DX FN 36; Tr. at 2612, 2613) and the next day HI stated it would respond within a week.

*See* DX FN 37, DX FN 38; Tr. at 2615, 2616. On October 11, 1991, HI objected to the "By Hilton Hotels Corporation" tag line and requested that the changes be postponed. *See* DX FN 39; Tr. at 646, 647, 2614–16. None of this jockeying by either side resolved anything.

On October 11, 1991 Cyril Stein, the Chairman of HI; Peter George, the Vice Chairman of HI; Barron Hilton, Chairman of HHC; and Greg Dillon, the high-ranking HHC executive, had lunch at HI's Park Lane Hilton in London. *See* Tr. at 1897, 1898, 3400–02. This was a cordial, pleasant luncheon where the subject of CONRAD and its signs, logos and advertisements never came up. Indeed, HHC was engaged in a round-the-world balloon project called Earthwinds Hilton in which Mr. Stein discussed the possible participation of HI. *See* Tr. at 3401.

Two business days later, October 16, 1991, HI filed this lawsuit. No mention of the intention to sue was made at the London luncheon by Mr. Stein. *See* Tr. at 1898.

Since the lawsuit was commenced, CONRAD hotels were opened in Istanbul, Turkey in May, 1992 (*see* Tr. at 1031) and Brussels, Belgium in April, 1993 (*see* Tr. at 1402). HI has competing hotels in those two cities.

The Court finds that the evidence submitted by the parties at trial shows a certain amount of name confusion concerning the name CONRAD. HI claims to have located 357 written references to CONRAD hotels as CONRAD HILTONS or HILTONS. *See* Plaintiff's Proposed Findings of Fact, at 63. Defendants grudgingly admit some name confusion caused by the use of the word CONRAD, but call it "underwhelming." *See* Defendants' Proposed Findings of Fact, at 63. In January, 1994 as the trial was in progress, President Clinton visited Belgium and stayed at the CONRAD Brussels. In commenting on the President's trip, the January 11, 1994 *New York Times* referred to the hotel as the "Conrad Hilton Hotel." PX 2103. However, the same situation exists, albeit to a lesser extent, with the VISTA properties. At trial, the defense introduced evidence showing confusion concerning the VISTA hotel in Pittsburgh which some people thought was a HILTON. *See* Tr. at 2467–79. The defense urges that this name confusion as to both the CONRADS and the VISTAS has diminished over time and that it has taken appropriate steps to correct any confusion.

Plaintiff conducted a "Hotel Name Study" at eight airports located throughout the United States. *See* PX 1181. This study was conducted by Dr. Henry Ostberg. 585 respondents were interviewed. A list of six hotel names was read to them as follows:

(1) Waldorf      (4) Best
(2) Marriott      (5) VISTA
(3) Conrad      (6) Inter-Continental

After each name was read, the interviewee was asked whether the name read to them was the complete or only part of the name of a hotel. Among business travelers 35 and older (*see* Tr. at 1749, 1923), 48.6% believed CONRAD was part of the name of a hotel and that the full name was CONRAD HILTON.

The defense objects to the survey but the Court does believe that it is relevant, although somewhat flawed. As the defense expert, Dr. Thomas Dupont, pointed out the question asked in the survey is leading and suggestive. It plants the idea that there is a second part to the name CONRAD. *See* Tr. at 3557. However, it is indisputable that a significant portion of those responding did associate the names and words CONRAD and HILTON. This association was understandably more significant the greater the age of the respondent and it is not surprising when the name CONRAD stands alone.

As the defense argues, HHC owns goodwill in the CONRAD name and mark. Since the early 1980's up to October 1991, HHC invested millions of dollars in marketing, advertising and promoting CONRAD hotels. The President of the hotels division of HHC, Carl Mottek, testified believably that

Q. If this court should order that you cease using all use of the name Conrad, will your business be injured in any way?

A. Significantly.

Q. How would it be injured?

A. The use of Conrad has now been in place for a number of years. We have built equity in it. Particularly the owners

of the hotel, multimillion dollars of investments have been built based on that equity. Conrad is a recognized name, and to reestablish a new name for those hotels would take a great deal of time, impacting occupancy and cost a great deal in advertising.

Q. Would the time that is required to build up a new name have an effect on your guest rates at hotels?

A. It would impact occupancy significantly.

Tr. at 3474.

The promotion of the CONRAD brand was not carried out in a furtive or secretive manner. At least as early as 1982 plaintiff was aware of defendants use and promotion of the name and brand CONRAD (*see* discussion *supra* at 16), but really did nothing to prevent it until this lawsuit was filed on October 16, 1991. Consumers and the travel industry have been educated for years to the effect that room reservations at CONRAD hotels can be made by calling HRS, the reservation system run jointly by plaintiff and defendants. Serious joint marketing programs were engaged in by the parties since 1989 using the name CONRAD (*see* discussion *supra* at 23) in marketing programs. DX JG4 shows that there were a total of at least 22 joint marketing programs involving direct mail, newsletters, promotional literature, print advertisements, direct sales efforts, radio and television advertisements. The total expenditures on joint marketing were just under $91 million. True, most of this money went to promote HILTON hotels, whether those of HI or those of HHC. The point is, however, that HHC was also advancing the cause of the CONRAD hotels by the joint marketing efforts and HI was well aware of that fact.

### CONCLUSIONS OF LAW

**I. Confusion as to Source and Sponsorship**

■ After presiding over the lengthy trial of this action, the conclusion is inescapable that consumers are confused regarding the source and sponsorship of CONRAD hotels. The survey conducted by HI, although not perfect, does show that an appreciable part

of the public, particularly those in their middle and later years, does become confused by the word CONRAD standing alone in the context of hotels. Other conclusions are equally inescapable, however—that the confusion surrounding the name CONRAD resulted from the actions of HI as well as from the actions of HHC, and that consumers are also confused over the sponsorship of the VISTA hotels. Indeed, as recently as Sunday April 30, 1995, the *New York Times* carried an HHC advertisement for the New York Hilton directly above an HI advertisement for the New York Vista, which carried a tag line that complied with the one-third rule, "operated by Hilton International." One could easily be misled into believing the two were related hotels.

Nearly 60 years ago, Judge Learned Hand set forth the rule concerning a defense of laches in *Landers, Frary & Clark v. Universal Cooler Corp.*, 85 F.2d 46 (2d Cir.1936). Judge Hand wrote:

The defendant spent large sums in reliance upon its apparent immunity, manifested in many ways. Moreover, the estoppel need not depend upon expenditure alone. When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses may be. No doubt if the defendant had gone ahead defiantly and fraudulently this would not count; nothing would (citing cases). But it did not do that; the new management knew nothing of the protest, if it can be called such; it was morally innocent, and it was given repeated assurance that it might go ahead. Equity will not upset what has been founded upon such solid ground; the plaintiff has itself to thank for any confusion which may result; it is too late after all these years now to restore the parties to their relative positions at the outset.

*Id.* at 49. Perhaps HHC's management was not given "repeated assurance that it might go ahead" in so many words. But, as a wise person once pointed out, "actions speak louder than words." The actions of HI regarding

joint reservations, joint marketing and joint advertising relative to the name CONRAD gave HHC the "repeated assurance" to which Judge Hand referred—that HHC might use the name CONRAD.

Not only did HI's actions assure HHC that it could use the name CONRAD, so too did the agreements between the parties. The 1978 agreements, PX 9 and PX 10, as well as PX 11, permitted the parties to use their HILTON company names in connection with the forthcoming CONRADs and VISTAs and to utilize the HRS in connection with the two non-HILTON brands. Again in 1990, in PX 12, the parties agreed that the HILTON name could be used to state the affiliation of the CONRAD and VISTA chains. There is no dispute that the hotel-using public did not differentiate between HHC and HI and viewed the two as one global hotel organization. The 1989 agreement, PX 11, in the context of joint advertising and marketing allowed the parties to make unrestricted use of the name HILTON in connection with CONRAD and VISTA. This certainly eroded the clause prohibiting "indirect" identification in the 1964 agreement. *See* PX 1.

Counsel for HI in his excellent closing argument (*see* Tr. at 4120) recognized that the 1978 agreements "necessarily resulted in some degree of confusion." However, he argued that very strict compliance by both sides with the one-third rule of PX 9 will insure that the "indirectly" provision of PX 1, the original 1964 agreement, will survive if HHC does not use the name CONRAD. The contention is that the following statement in PX 9, the one-third agreement, saves the 1964 agreement: "Nothing herein contained shall be deemed to take away from or limit in any manner whatsoever the other rights of the parties contained in paragraph 4 and in the other provisions of the" 1964 agreement—if PX 9 is carefully adhered to. The Court disagrees. The eggs are scrambled and an omelette has resulted.

## II. HI's Breach of Contract and Breach of Implied Covenant Claims

▪ The first two causes of action asserted by Plaintiff are for breach of contract and breach of an implied covenant not to dero-gate from the value of the goodwill transferred from HHC to HI. The Court easily concludes that HHC was guilty of the breaches. The trouble with these claims, however, is that both sides are guilty of these breaches, not just HHC. HI was guilty of all kinds of violations of the various agreements (*see supra* Findings of Fact at 27–28) and so was HHC (*see supra* Findings of Fact at 28–29). Sitting as a Court of equity, as this Court is, there is a need to craft an answer to the problem created by both parties and the 1978, 1989 and 1990 agreements, all of which invited violations of the 1964 agreement, PX 1.

HI, relying on the case of *Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir.1979), argues that that decision is controlling and mandates an injunction against any use of the name CONRAD by HHC. In *Levitt*, the Second Circuit affirmed the imposition of sweeping injunctive relief against a well-known builder, William J. Levitt, to prevent his continued promotion of his name following the sale of his construction business, including the goodwill and trademarks associated therewith. The Court disagrees that *Levitt* requires an injunction against any use of the name CONRAD. *Levitt* is distinguishable. In that case, Mr. Levitt sold his whole and entire interest in the name "Levitt." In this case, HHC retained many rights in the HILTON name and both parties to this litigation have enjoyed the use of the name HILTON over the years.

HHC asserts numerous defenses to HI's quest for equitable relief. In addition to the defense of laches discussed above, HHC also raises the defense of "unclean hands" to HI's desire for an injunction. There is no question that the VISTA chain and its promotion by HI (*see supra* Findings of Fact at 27–28) amounted to the type of activity by HI which HI now seeks to enjoin HHC from engaging in relating to CONRAD. HI has some need to figuratively rinse its hands under some warm water with soap. The doctrine of equitable estoppel also aids HHC. HI initially never objected to the use of the name CONRAD and in fact intentionally promoted CONRAD as a part of the HILTON family of hotels. HI, by its conduct, therefore in-

duced HI to rely on the fact that HHC had no objection to its use of the name CONRAD.

HHC also raises statute-of-limitations affirmative defenses which there is no need for the Court to address. These defenses relate to CONRAD JUPITERS CASINO and LA BELLE CREOLE. Inasmuch as HI indicated at trial that it has "no problem" with these properties, the Court dismisses all of plaintiff's claims that relate to those properties. *See supra* Findings of Fact at 17.

HI's argument that HHC is guilty of "progressive encroachment" is rejected. This is a breach of contract case and the doctrine has apparently only been applied in trademark infringement cases. Even were progressive encroachment to apply in litigation involving a contract dispute, the facts do not support the application of the doctrine. HI has known for years that HHC intended to compete with HI internationally and did nothing about it. In Australia, HHC actually did compete to some extent with HI as the CONRAD chain grew elsewhere.

However, HI's laches, acquiescence, estoppel and unclean hands, in the Court's view, do not completely mandate against any relief being awarded to HI. HI's contractual rights have been breached and HI is entitled to at least some relief.

As a preliminary matter to crafting an injunction, the Court notes that HI has acknowledged that the agreements do not preclude HHC from using the name CONRAD so long as there is no reference to Conrad Hilton or Hilton in the use of the name or in promoting the CONRADs. *See* Tr. at 4125–26. None of the agreements expressly prohibit the use of the name CONRAD and the post 1964 agreements implicitly permitted its use by including it in HRS and joint marketing.

### III.  The Injunction

█ The Second Circuit Court of Appeals has afforded this Court a broad umbrella of discretion to fashion an injunction in this action. *See Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733 (2d Cir.1994). The Court believes the following injunction is warranted:

1.  The one-third rule, contained in the September 19, 1978 letter agreement, PX 9, is hereby revoked. The parties no longer may use the word "Hilton" as part of their company name to state the fact that the company owned, operated, or licensed the hotel in the other party's territory, provided that such reference did not appear in greater than one-third the size of the actual hotel name.

2.  CONRAD hotels may continue to be called by the name CONRAD. However, they must be called CONRAD International Hotels, without any reference at all in their title to the name HILTON. The name CONRAD may not stand alone as there is evidence that CONRAD standing alone causes confusion.

3.  As for the VISTAs, they may continue to be called VISTA. Likewise, there may be no reference whatsoever to HILTON in connection with the name VISTA. They may be called either VISTA National Hotels or VISTA Hotels.

4.  Both parties may continue to list CONRADs and VISTAs in HRS and may continue to use the 1–800–HILTONS phone number.

5.  Inasmuch as HI has canceled its participation in most joint marketing programs by terminating PX 11 (*see supra* Findings of Fact at 12), there is no chance of HHC advertising CONRADs in HI campaigns or of HI advertising the newly reopened New York VISTA in HHC campaigns opposite the New York Hilton. Therefore, the Court need not address this eventuality.

6.  Both HI and HHC are permanently enjoined from using the name HILTON in connection with their flags, logos, signage, and advertising of the CONRAD and VISTA brands.

7.  In advertisements relating to HRS (1–800–HILTONS), CONRADs may be listed in HHC print advertisements in a separate part of the advertisement where the CONRADs are listed together. The same rule applies to VISTAs.

8.  Television and radio advertisements for the CONRAD and VISTA brands may

not refer to HILTON except that they may refer to HRS, 1–800–HILTONS.

9. In seeking funding for future hotels outside their prime territory, each side may let the potential investor know that the financial backing of HHC or HI is involved.

10. HRS may continue to exist as is but if a caller seeks information about a hotel in the other's prime territory the HRS operator must first recite the hotels of the prime party. To illustrate: if a caller to HRS asks about a HILTON in New York he/she is to be referred first to the Waldorf Astoria or New York Hilton (New York City is HHC prime territory) and last to the newly reopened VISTA. Conversely, should inquiry be made e.g., concerning a reservation in Brussels, the HI Brussels must be mentioned prior to any reference to the CONRAD because Brussels is HI's prime territory.

The Court recognizes that this solution may not be perfect—probably it satisfies neither side! However, in a real sense, intelligent business people and professionals caused the confusion and must live with the Court's efforts to clarify the disorder. The Court sincerely believes that the interests of both HI and HHC are best served by this resolution.

## IV. HI's False Advertising and Unfair Competition Claims

Plaintiff has also made a claim under Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a). HI's contention in this regard is that the statement by defendants that CONRADs were "the first international hotels with standards proud enough to bear his (Conrad Hilton's) name" (*see supra* Findings of Fact at 28) were false on their face. To prevail on a "false advertising claim" under § 43(a), HI must: (1) show that the challenged statement is literally false; or (2) show through a consumer survey that, although the challenged statement is ambiguous or literally true, the advertising is nonetheless misleading, confusing or deceiving in that the message understood by a significant number of consumers is false. *See Coca-Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d

312, 317 (2d Cir.1982). There has been no survey on this issue. The argument that the statement in question is literally false fails. The use of the word "proud" makes the whole statement subjective and ambiguous and in the Court's view the advertising is an example of the "puffery" not forbidden under the Lanham Act. In any event, HHC stopped using the slogan when HHC protested it. The pendent claim for unfair competition fails because it is essentially the same as the Lanham Act claim. *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624 (2d Cir.1983).

## V. HHC's Counterclaims

HHC's counterclaim relating to breach of the trademark agreements has been addressed. *See supra* Conclusions of Law at 36. Both sides have breached the various agreements. The injunction crafted above addresses the breaches by both HI and HHC.

The second counterclaim asserted by HHC is for *prima facie* tort. To prove a *prima facie* tort, HHC must show "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990). A defendant must act with "disinterested malevolence" to be liable. *See id. See also Chen v. United States,* 854 F.2d 622, 627–28 (2d Cir.1988). There has been no proof of malevolence on the part of HI. The defendants failed to offer any evidence at trial to support their contention that HI terminated joint marketing programs solely to harm defendants. The *prima facie* tort counterclaim is therefore dismissed.

Should either side wish to craft a more specific injunction in the spirit of this Opinion or to pursue the damages issue a conference may be requested and will be scheduled. In the event that no conference is requested by June 2, 1995, the Court will order this case closed.

**SO ORDERED.**